NORTHEAST HEALTH MANAGE-MENT, INC. and McLean County General Hospital, Inc., Appellants,

v.

Kimberly Jan COTTON and Pamela Howell, Appellees.

No. 2000–CA–000332–MR.

Court of Appeals of Kentucky.

Sept. 7, 2001.

Timothy R. Coleman, Morgantown, KY, for Appellant.

W. Keith Ransdell, Lexington, Bradley P. Rhoads, Owensboro, KY, for Appellee.

Before JOHNSON, KNOPF and MILLER, Judges.

### OPINION

JOHNSON, Judge.

Northeast Health Management, Inc., and McLean County General Hospital, Inc., have appealed from a judgment entered on December 2, 1999, by the McLean Circuit Court which followed a jury verdict which awarded Kimberly Cotton and Pamela Howell compensatory and punitive damages for wrongful termination and constructive discharge.[1] The hospital raises

---

1. The appellants will be referred to jointly as "the hospital".

several arguments on appeal: (1) the evidence was insufficient to support a finding that the conditions created by the hospital, through administrator Mynette Dennis, created intolerable employment conditions; (2) the jury's verdict that the hospital wrongfully discharged Cotton and Howell as a result of Dennis' request that they commit perjury was not supported by the evidence and was clearly erroneous; (3) the jury's finding that Howell was discharged as a result of her refusal to alter business records was clearly erroneous and based solely upon supposition and speculation because Howell failed to produce any evidence to support that such a request was in violation of a legislative enactment; (4) punitive damages were not warranted because the hospital did not act with malice or gross negligence towards Cotton and Howell; (5) the trial court failed to properly instruct the jury with regard to punitive damages; (6) the introduction of testimony of Kathleen Haley for the purpose of impeaching Dennis was improper; and (7) the trial court abused its discretion by allowing improper character evidence to be heard. Having concluded that no reversible error occurred, we affirm.

From November 1988, until November 1996, Northeast Health Management, Inc. and McLean County General Hospital, Inc., operated the McLean County General Hospital. Cotton and Howell were employees at this hospital which had a small staff. Cotton was employed as the activities director and handled general office duties. Howell was employed as the business office clerk.

Dennis was employed as the hospital administrator between 1988 and 1996 and she was primarily responsible for the day-to-day operations of the hospital and had significant input on all decisions relating to hospital personnel. She had the ability to both hire and fire employees and could change employees' job duties and assignments. Prior to March 1995, Cotton and Howell had a very good working relationship with Dennis. However, in March 1995, Dennis was charged with shoplifting a bottle of suntan lotion from a local tanning salon.

In April 1995, Dennis and her daughter, along with some of her daughter's friends, decided to take a vacation in the Bahamas. Dennis invited both Cotton and Howell to go on the trip. According to Dennis, the vacation package would cost less per person if additional people went. Howell went on the trip, but Cotton did not go because she had previously made plans for another vacation at the same time.

Shortly after returning from the Bahamas, Dennis called Cotton and Howell into her office for two meetings during which she discussed the events that led to her shoplifting charge.[2] Cotton and Howell claim that Dennis told them to be seated and she provided them pen and paper and asked them to take notes. The notes, which were introduced at trial, included additions in Dennis' handwriting which she acknowledged. Cotton and Howell claim that Dennis wanted them to testify that they overheard a conversation over the speaker phone between Dennis and an employee at the tanning salon. At the second meeting, both Cotton and Howell told Dennis that they could not testify falsely, and they claim Dennis responded harshly, "Fine!"

It is from this point that Cotton and Howell allege that their working relation-

2. During the trial, Dennis could only remember one meeting, but she did not dispute that she met with Cotton and Howell to discuss her situation. Dennis claimed she never asked them to perjure themselves.

ship with Dennis turned cold and bitter. Cotton claimed at trial that when she refused to perjure herself she felt as if her days were numbered at the hospital. Howell testified that, "[Dennis] didn't immediately banish us to different rooms or she didn't start up with everything, but it was a slow and escalating thing, but it started at that point in time." In October 1995, Dennis went to trial on the shoplifting charge and was convicted by a McLean County jury.

Cotton and Howell claim that after the trial the atmosphere at the hospital was significantly different. They claim that communication between Dennis and themselves became strained and that Dennis would give them nasty glares and talk badly about them behind their backs. Other employees agreed that the working environment changed after the shoplifting conviction. Joann Ashby testified that after Dennis' conviction, the relationship between Dennis and Cotton and Howell changed. She testified, "[y]ou could see it changing a lot. They were—it wasn't as close or anything. You could—they were off to their self more and everything. You could tell that. There was trouble going on." Another former employee, Linda Frey, testified, "then all of a sudden, it was like an icy isolation. A coldness." Finally, according to Cotton and Howell, Dennis completely cut off verbal communication with them and simply left notes on their desks.

Along with the general change in the work environment, Cotton and Howell claim that Dennis took more overt actions against them following her shoplifting conviction. Howell testified that she received permission to go to a funeral for a family member and that upon returning she learned that Dennis had been making negative comments about the fact that she had taken the time off from work. Also, both

Cotton and Howell claim that for Christmas or year-end bonuses, they normally received gift certificates valued at between $45 $60. After the shoplifting incident, they only received a gift certificate valued at $15, the same every other employee received.

In early 1996, Cotton began to receive bills for lab and x-ray services provided to her at the hospital. Cotton testified that prior to the shoplifting incident she had received similar services as a benefit of her employment at the hospital.

In May 1996, an individual and some of his companions pulled into the parking lot of McLean County General Hospital. This individual never entered the hospital, but instead went to a hospital in Owensboro for treatment and subsequently died. As a result of this incident, McLean County General Hospital was investigated by the Commonwealth of Kentucky for improper patient transfer procedures. According to Howell, Dennis approached her during the investigation and asked her to prepare and backdate a document which would show that the nurses had the proper training and the proper policies were in place to deal with transferring emergency patients. Howell testified that she refused to type the fraudulent document.

After this document incident, Cotton and Howell claim Dennis' treatment of both of them became even worse. They claim Dennis constantly watched over them and would make disparaging comments about them. They also claim Dennis required them to meet strict break and lunch times and they were not permitted to communicate with each other. They claim that no other employees were assigned strict break and lunch times and that previously their breaks had always been flexible and were usually taken with Dennis. Both Cotton and Howell were asked to return their office keys and they were not allowed

to attend medical staff meetings. Furthermore, Cotton testified that after July 1996 she was not permitted to use the telephone even though many of her job duties required using the telephone. Dennis testified that she requested that Cotton limit her phone usage when making personal calls. Also, Cotton was moved to a desk which was down a hallway and facing a wall.

Cotton and Howell testified that these events caused significant stress in both their personal and professional lives resulting in stress-related vomiting and diarrhea. In early October 1996, both Cotton and Howell tendered resignation letters to Dennis. Copies of the letters were also sent to Harold McBee, President and CEO of Northeast. The only response ever received to these letters was a letter from Dennis to Cotton, stating:

> I received your letter of resignation from this facility on Oct. 8, 1996. Thank you so much, I appreciate it, and your resignation is accepted and effective as of Oct. 8, 1996.
>
> Your final check will be placed in the mail on Friday, Oct. 18, 1996.
>
> Thank you again,
>
> Mynette Dennis

On April 1, 1997, Cotton and Howell filed a lawsuit against Northeast alleging wrongful discharge and seeking compensatory and punitive damages. In an amended complaint filed on September 17, 1997, Cotton and Howell added McLean County General Hospital and Dennis as defendants. Cotton and Howell realleged their previous claims and also alleged the intentional infliction of emotional distress. The case was tried before a jury in November 1999. The trial court entered a directed verdict in favor of Northeast, McLean County General Hospital and Dennis on Cotton's and Howell's claims of intentional infliction of emotional distress. The other claims against Northeast and McLean County General Hospital were submitted to the jury.

The jury found in favor of Cotton and Howell and awarded Cotton $6,171.00 for lost wages and Howell $5,060.00 for lost wages. Cotton and Howell were each awarded $15,000.00 for mental anguish and $75,000.00 each in punitive damages. The trial court denied the hospital's motion to set aside the verdict or to grant a new trial. This appeal followed.

▬▬ The hospital's first claim of error is that the evidence at trial did not support a finding that it created intolerable working conditions. During trial, Cotton and Howell argued that they were constructively discharged by the actions of Dennis. The commonly accepted standard for constructive discharge is "whether, based upon objective criteria, the conditions created by the employer's action are so intolerable that a reasonable person would feel compelled to resign."[3] This Court cannot substitute its judgment for that of the jury.[4] In *Bierman v. Klapheke*,[5] our Supreme Court stated:

> All evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact. The prevailing party is entitled to

3. *Commonwealth, Tourism Cabinet v. Stosberg*, Ky.App., 948 S.W.2d 425, 427 (1997)(citing *Darnell v. Campbell County Fiscal Court*, 731 F.Supp. 1309 (E.D.Ky.1990); and *Humana, Inc. v. Fairchild*, Ky.App., 603 S.W.2d 918 (1980)).

4. *Humana, supra* at 922.

5. Ky., 967 S.W.2d 16, 18–19 (1998).

all reasonable inferences which may be drawn from the evidence.

. . .

The reviewing court, upon completion of a consideration of the evidence, must determine whether the jury verdict was flagrantly against the evidence so as to indicate that it was reached as a result of passion or prejudice. If it was not, the jury verdict should be upheld [citation omitted].

■ In its brief, the hospital argues that the "intolerable" conditions claimed by Cotton and Howell were as follows:

(1) Ms. Dennis was not overly communicative with the appellees. The appellees did not say that Ms. Dennis treated them harshly, only that she was not as communicative.

(2) Ms. Howell's work hours were changed.

(3) Ms. Howell's and Ms. Cotton's lunch times were set at a specified time.

(4) Their break times were set at a specific time.

(5) They were told not to return to the premises after work hours.

(6) They did not feel they could adequately communicate with Ms. Dennis or other Hospital personnel.

(7) They felt as if they were being closely watched by Ms. Dennis.

This is the same type of argument the hospital presented to the jury; and clearly, the jury did not accept its argument of the evidence. Cotton and Howell claim the intolerable work conditions created by Dennis followed their refusal to perjure themselves in her criminal trial. While the conditions alleged may not have been

the most egregious imaginable, they surely rise to the level that the jury had sufficient evidence to find a constructive discharge. It should be noted that Cotton and Howell did not claim that they were simply assigned lunch and break times, but that the assignments were given to them and not to other employees in an attempt to ostracize them from the rest of the employees and each other. Furthermore, they claimed Dennis cut off communication with them in retaliation for their refusal to perjure themselves. They contend that Dennis' actions created a tense atmosphere at the hospital and that the working conditions at this small hospital eventually became unbearable for both of them. Moreover, many of these allegations were supported by the testimony of other hospital employees. Dennis failed to present any witnesses, other than herself, to contradict Cotton's and Howell's allegations. Accordingly, we hold that the evidence was sufficient to support the jury's finding that Dennis' actions constituted a constructive discharge of Cotton and Howell.

■ The hospital's second claim of error is that Cotton's and Howell's alleged discharge did not fall within one of the recognized exceptions to the terminable-at-will doctrine. The general rule is that an employer may discharge an "at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." [6] In *Grzyb v. Evans*,[7] our Supreme Court stated:

We adopt, as an appropriate caveat to our decision in *Firestone Textile Co. Div. v. Meadows, supra*, the position of the Michigan Supreme Court in *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 316 N.W.2d 710

6. *Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, Ky., 666 S.W.2d 730, 731 (1983)(citing *Production Oil Co. v. Johnson*, Ky., 313 S.W.2d 411 (1958); and *Scro-* ghan v. Kraftco Corp., Ky.App., 551 S.W.2d 811 (1977)).

7. Ky., 700 S.W.2d 399, 402 (1985).

(1982). The Michigan court held that only two situations exist where "grounds for discharging an employee are so contrary to public policy as to be actionable" absent "explicit legislative statements prohibiting the discharge." 316 N.W.2d at 711. First, "where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment." Second, "when the reason for a discharge was the employee's exercise of a right conferred by well-established legislative enactment." 316 N.W.2d at 711–12. Here the concept of an employment-related nexus is critical to the creation of a "clearly defined" and "suitably controlled" cause of action for wrongful discharge. These are the limitations imposed by *Firestone Textile Co. Div. v. Meadows, supra* at 733.

■ The hospital seems to argue that because Cotton and Howell worked for more than a year after Dennis requested them to perjure themselves that their claims of retaliation are unlikely and unbelievable. Unfortunately for the hospital, the jury sided with Cotton and Howell and the hospital has not cited any support for its contention that this lapse in time has any legal significance. We believe Cotton and Howell sufficiently met the first prong of the two-part test in *Grzyb* that is required to qualify as an exception to the terminable-at-will doctrine. Specifically, in the course of their employment, Dennis asked Cotton and Howell to violate a law by requesting that they perjure themselves.

■ Next, the hospital argues that even assuming that Dennis asked Cotton and Howell to perjure themselves, this act lacks the necessary employment-related nexus to their employment as required by *Firestone* and *Grzyb, supra*. We find no merit in the hospital's argument that Dennis' request to have Cotton and Howell perjure themselves lacks the necessary employment-related nexus. Dennis called Cotton and Howell into her office for two meetings while they were at work to discuss their possible testimony at her shoplifting trial. Later, when both employees refused to perjure themselves, Dennis made their working environment difficult and uncomfortable to the point that they were forced to resign. We believe that it is insignificant that Dennis asked Cotton and Howell to violate a law in a matter that was personal to Dennis. The request and retaliation by Dennis was nonetheless an abuse of her authority as Cotton's and Howell's supervisor.

■ Next, the hospital argues that the jury's finding that Howell was constructively discharged based in part due to her refusal to backdate a business record at the request of Dennis was clearly erroneous because Howell failed to produce any evidence that such a request was in violation of a legislative enactment. At trial it was argued that if Howell were to backdate this particular document she would have violated KRS [8] 517.050, which states:

(1) A person is guilty of falsifying business records when, with intent to defraud, he:

 (a) Makes or causes a false entry to be made in the business records of an enterprise; or

 (b) Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of an enterprise; or

 (c) Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed

8. Kentucky Revised Statutes.

upon him by law or by the nature of his position; or

(d) Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.

The trial court ruled that based on Howell's testimony a jury could reasonably find that she was asked to unlawfully alter a business record.

Howell testified at trial that she typed most of the policies and procedures that were in place at the hospital that were required by the Commonwealth in order for the hospital to maintain its license and to be paid through Medicare and Medicaid. Howell testified that Dennis approached her after the 1996 improper transfer incident and asked her to backdate a business record. Specifically, Howell testified that Dennis told her the hospital did not have documentation to show that the nurses had the proper training in transporting patients or concerning the procedures to follow to stabilize a patient before he was transferred. Howell further testified that according to Dennis the Commonwealth required a document that was not in the hospital's existing record of policies and procedures. Howell testified that Dennis asked her to type the document and to date it prior to the incident, which she refused to do. We believe Howell's testimony constituted sufficient evidence to support the jury's finding that Dennis requested her to falsify a business record in violation of KRS 517.050.

■ The hospital also claims that punitive damages were not warranted because the hospital did not act with malice or gross negligence towards Cotton and Howell; and even assuming it did, punitive damages were not warranted pursuant to KRS 411.184(3). In a related argument, it argues that the trial court improperly instructed the jury on punitive damages.

For its argument, the hospital quotes from *Horton v. Union Light, Heat & Power Co.,*[9]

> In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by "wanton or reckless disregard for the lives, safety or property of others." This bears an element not distinguishable from malice implied from the facts.

*Horton* did not involve a claim of wrongful discharge, and thus is distinguishable from the case *sub judice.*

This Court in *Simpson County Steeplechase Ass'n, Inc. v. Roberts,*[10] addressed the availability of punitive damages in a wrongful discharge case. The Court noted that [u]nder KRS 411.184(1)(f), " '[p]unitive damages' includes exemplary damages and means damages, other than compensatory and nominal damages, awarded against a person to punish and to discourage him and others from similar conduct in the future." Further, KRS 411.184(2) states, "[a] plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." This Court in *Roberts, supra,* stated, "[t]he key element in deciding whether punitives are appropriate is malice or conscious wrongdoing. Malice may be implied from outrageous conduct and need not be express so long as the conduct

9. Ky., 690 S.W.2d 382, 389–90 (1985).

10. Ky.App., 898 S.W.2d 523, 525 (1995)(citing *Hensley v. Paul Miller Ford, Inc.,* Ky., 508 S.W.2d 759 (1974); and *Harrod v. Fraley,* Ky., 289 S.W.2d 203, 205 (1956)).

is sufficient to evidence conscious wrong-doing."[11] This Court in *Roberts,* recognized that punitive damages can be recovered in a wrongful discharge case:

> Generally, punitive damages have been allowed in actions for wrongful discharge of an at-will employee where the action has been based upon the claim that the discharge was in violation of public policy. Courts have reasoned that such a violation sounds in tort and that all damages including punitives are available. Punitive damages are thus used as a deterrent [citations omitted].[12]

The hospital argues that under KRS 411.184(3) it should not be liable for Dennis' actions. KRS 411.184(3) provides, "[i]n no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question." This Court addressed the application of KRS 411.184(3) in *Roberts, supra,* where the employer's agent discharged ten employees for union activity:

> In the instant case, Shannon, the owner and sole shareholder of Simpson County Steeplechase, stated that Pessin had sole, unfettered discretion and authority to operate Dueling Grounds and to hire and fire employees. Shannon would occasionally consult with Pessin, but basically gave Pessin a blank check to do as he wished. Thus, this is not merely an agent/employee case. Further, the jury heard all of the evidence and was also free to believe or disbelieve the statements by Shannon and whether he had knowledge of the events surrounding the appellees.[13]

In the case *sub judice,* it is undisputed that Dennis had the sole discretion to hire and fire employees. Moreover, the record reflects that the hospital provided very little direct supervision over Dennis' supervisory conduct. Accordingly, we believe consistent with *Roberts* that Cotton and Howell presented sufficient evidence to warrant an award of punitive damages against the hospital.

■ In order to address the hospital's claim that the trial court's instructions on punitive damages were insufficient, we quote from the trial court's jury instructions as follows:

> If you find for the Plaintiffs, or either one of them, in this action and if you are further satisfied from the evidence that Defendants Northeast Health Management, Inc. and Mclean County General Hospital, Inc. acted toward the Plaintiffs with oppression, fraud, malice, or gross negligence, you may in your discretion award punitive damages against Defendants Northeast Health Management, Inc. and McLean County General Hospital, Inc. in addition to the damages awarded.
>
> As used in this instruction:
>
> "Oppression" means conduct that was specifically intended by Defendants Northeast Health Management, Inc., and McLean County General Hospital, Inc. to subject Plaintiff to cruel and unjust hardship; and
>
> "Malice" means (a) conduct that was specifically intended by Defendants Northeast Health Management, Inc. and McLean County General Hospital, Inc. to cause tangible or intangible injury to Plaintiff, OR (b) conduct that was carried out by Defendant with both a fla-

11. *Id.*

12. *Id.* at 526.

13. *Id.* at 527.

grant indifference to Plaintiff's rights AND a subjective awareness that such conduct would result in human death or bodily harm; and

"Fraud" means an intentional misrepresentation, deceit, or concealment or material fact known to the Defendants Northeast Health Management, Inc. and McLean County General Hospital, Inc. and made with the intention of causing injury on the plaintiff.

"Gross negligence" means reckless disregard for the rights of others, including the rights of Plaintiffs.

If you award punitive damages, in determining the amount therefore you should consider the following factors:

 (a) the likelihood at the time of such misconduct by Defendants Northeast North [sic] Management, Inc. and McLean County General Hospital, Inc. that serious harm would arise from it;

 (b) the degree of Defendants Northeast Health Management and McLean County General Hospital, Inc. awareness of that likelihood;

 (c) the profitability of the misconduct to Defendants Northeast Health Management, Inc. and McLean County General Hospital, Inc.

 (d) the duration of the misconduct by Defendants Northeast Health Management, Inc. and McLean County General Hospital, Inc. and

 (e) any actions taken by the Defendants Northeast Health Management, Inc., and McLean County General Hospital, Inc. to remedy the misconduct once it became known to the Defendants Northeast Health Management, Inc. and McLean County General Hospital, Inc.

KRS 411.186(2) sets forth the factors to be considered when determining the amount of punitive damages to be awarded:

If the trier of fact determines that punitive damages should be awarded, the trier of fact shall then assess the sum of punitive damages. In determining the amount of punitive damages to be assessed, the trier of fact should consider the following factors:

(a) The likelihood at the relevant time that serious harm would arise from the defendant's misconduct;

(b) The degree of the defendant's awareness of that likelihood;

(c) The profitability of the misconduct to the defendant;

(d) The duration of the misconduct and any concealment of it by the defendant; and

(e) Any actions by the defendant to remedy the misconduct once it became known to the defendant.

We believe the above instructions sufficiently addressed the general nature of KRS 411.186(2). The hospital has not cited us to any case nor have we found one which states that the language of this statute must be precisely followed. Thus, we find no error in the trial court's punitive damages jury instruction.

 The hospital further contends that "[t]he evidence did not sufficiently support an award of mental anguish" for Cotton and Howell. The hospital argues that Cotton and Howell "testified considerably with regard to the mental anguish they endured *during their employment with the [h]ospital*" [emphasis original]. The hospital claims that since "[t]here was no testimony ... with regard to any emotional distress occurring after they resigned from their employment" their damage claims for mental anguish are barred by the exclusive remedy provision of KRS

342.690. We believe the hospital has effectively waived any defense that this case was governed by the Workers' Compensation Act. The hospital did not raise this defense until its motion for a directed verdict at the end of the trial. The trial court denied the motion at that time ruling that Cotton and Howell had sufficiently proved that they suffered mental anguish after their employment ended with the hospital. The exclusive remedy provision of KRS 342.690 is an affirmative defense which must be pled and proven and the failure to do so constitutes a waiver of the defense.[14]

 The hospital's next claim of error is that the introduction of testimony from Kathleen Haley for the purpose of impeaching Dennis was improper. During cross-examination, Dennis was asked about Howell's allegation that Dennis requested her to backdate a document. The following colloquy occurred:

> Q: But there didn't come a time in July of 1996, when the State said we'd like to look at this policy now and you, in fact, went to Pam and said type it up, we'll tell them it was here all along?
>
> A: I don't recall that. Sure don't.
>
> Q: You don't recall that? You, in fact, deny it after we've been through this?
>
> A: I—I—alright. What I'm—what I'm saying here is everything we had in place we had to have in place every year. It was not—there was not things in July of '96 particularly that we needed that I know of. They could have requested something.

During her direct testimony Haley testified as follows:

Q: While you were there, was the investigation [Cobra violation for improper transfer] going on?

A: Yes. It was.

Q: Was there anything that went on during that investigation that made you uncomfortable?

A: Yes. There was.

Q: Please tell me what that is.

A: The State was there investigating and they asked Mynette Dennis for some paperwork regarding my job description for the ER, which should have been in place before my employment. Mynette went into the clinic and wrote the information in, backdated it and stated that it had been in place all through my employment.

The substance of Haley's testimony was that she personally had been asked to backdate a document during the COBRA investigation. Haley did not testify that she was in the presence of Howell and Dennis when Dennis allegedly asked Howell to backdate a document. However, the trial court allowed Haley to testify and stated:

> I believe that it ought to be admitted, because I believe Ms. Dennis, instead of just saying no, I did not ask Ms. Howell to alter documents. She said no, it just wasn't done, we had them there, and I believe it does go to impeach her as to the issue of credibility of Ms. Dennis, so I'm going to admit it.

After reviewing the record, we agree that Dennis opened the door to Haley's rebuttal testimony. In her testimony, Dennis not only denied that she had asked Howell to backdate a document, but repeatedly maintained that all of the documents were in

---

**14.** *Gordon v. NKC Hospitals, Inc.,* Ky., 887 S.W.2d 360, 362–63 (1994); Kentucky Rules of Civil Procedure 8.03.

place during the investigation and thus it was not necessary to backdate anything.

The hospital relies on *Cincinnati, N.O. & T.P.Ry.Co. v. Prewitt's Adm'r*,[15] which involved an action for the wrongful death of a young man crossing a railroad track in his car. An issue arose as to whether the railroad's watchman was at his watch at the time of the accident and whether he sounded an alarm. The time of the accident was 2:45 a.m. On cross-examination the plaintiff asked the watchman if he was at his post at 10:30 p.m. and 12:30 a.m. After the watchman claimed he was at his post, the plaintiff called witnesses to testify that he was not. The Court reversed the trial court and ruled that if a witness is cross-examined as to a collateral fact his answer is conclusive.[16]

In the case *sub judice*, the issue is whether Dennis had the necessary policy and procedures in place and whether she requested or instructed Howell to backdate a document. In her testimony, Dennis broadly denied that the incident took place, but more importantly, she testified that everything was in order during the investigation. We believe the case *sub judice* is distinguishable from *Prewitt* because in *Prewitt* it was irrelevant whether the watchman was at his watch at any other time other than when the accident occurred. In the present case, whether all the hospital's necessary paperwork was in order during the investigation was clearly relevant. The determination of whether a matter is collateral is for the trial court to determine and thus its decision is reviewed under the abuse of discretion standard.[17] We find no abuse of discretion by the trial court in allowing this testimony by Haley.

The hospital's final claim of error is that the trial court abused its discretion by allowing the introduction of character evidence. The hospital argues that two former employees, Linda Frey and Joann Ashby, testified for the purpose of showing Dennis' lack of character for truth and veracity. The hospital argues that the sole purpose of their testimony was to inflame the jury and thus it should have been excluded.

After reviewing the record, it is clear that Frey and Ashby served a purpose other than inflaming the jury. Both Frey and Ashby were able to corroborate Cotton's and Howell's testimony that the work environment changed after Dennis' conviction for shoplifting. More specifically, they both were able to support Cotton's and Howell's version of the facts that Dennis wrongfully singled them out and treated them significantly different after the conviction.

After the proper foundation had been presented, both Frey and Ashby were asked to give their opinion of Dennis' reputation in the community. Both of them testified that she had a reputation for dishonesty. Kentucky Rules of Evidence 608 states:

> Opinion and reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to the limitation that the evidence may refer only to general reputation in the community.

Both Frey and Ashby satisfied the requirements of KRE 608, thus their testimony was properly admitted.

**15.** 203 Ky. 147, 262 S.W. 1 (1924).

**16.** *Id.* at 6, 262 S.W. 1.

**17.** *Wickware v. Commonwealth*, Ky., 444 S.W.2d 272, 275–76 (1969).

Having found no reversible error, the judgment of the McLean Circuit Court is affirmed.

ALL CONCUR.