NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0658n.06

Nos. 13-6406/13-6472

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| CLINTON BURTON, | ) | |
| | ) | |
| Plaintiff-Appellant/Cross-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ZWICKER & ASSOCIATES, PSC aka Zwicker & | ) | COURT FOR THE EASTERN |
| Associates PC, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellee/Cross-Appellant. | ) | |
| | ) | |

BEFORE:    COLE, Chief Judge; ROGERS and ALARCÓN,[*] Circuit Judges.

ROGERS, Circuit Judge.   In this civil rights case, Clinton Burton and his ex-employer Zwicker & Associates PSC dispute whether there was enough evidence to support a jury's verdict that Zwicker fired Burton for refusing to commit perjury in violation of Kentucky public policy.   While Burton still worked at Zwicker, the company was sued by ex-employees who alleged that Zwicker had discriminated against them.   Outside counsel for Zwicker conducted interviews to investigate these claims.   Burton was identified as a potential witness and interviewed several times.   During these interviews, Burton made statements that supported the former employees.   Burton's supervisors never specifically asked him to commit perjury and Burton never made a statement under oath.   But at trial, Burton did recount statements made by his supervisors which the jury could have interpreted as threatening Burton with termination if he

---

[*] The Honorable Arthur L. Alarcón, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

did not lie to Zwicker's outside counsel, and thereby committed himself to lie on the witness stand. This evidence was sufficient to support Burton's public policy claim. The parties also dispute whether the district court properly reduced the jury's initial award of $600,000 in punitive damages to $350,000. Because Zwicker's conduct was not as reprehensible as other types of conduct and because Burton received a relatively large award of compensatory damages, the district court properly modified the award to $350,000 so that it complied with due process. Zwicker argues that the jury awarded Burton too much back pay because the jury failed to take into account the fact that Burton mitigated his damages by obtaining post-termination employment. However, the burden was on Zwicker to prove how much money Burton earned. Zwicker failed to offer that evidence, and therefore the district court did not abuse its discretion in letting the jury's award of back pay stand. Finally, we reject Burton's argument that he should have been reinstated to his position at Zwicker or awarded front pay.

Burton, a black man, worked for Zwicker, a national law firm that specializes in debt collection, for about three years. Burton began his career at Zwicker as an entry-level collector. His job involved convincing credit card holders to pay their delinquent bills. Burton did well as a collector, and Zwicker quickly promoted him to a collections manager position. As a manager, Burton supervised a team of collectors. Zwicker paid Burton a base salary of around $40,000 a year, but Burton could earn substantial bonuses if his team hit certain collections goals.

At trial, the jury heard about a number of troubling incidents that occurred at Zwicker. Some Zwicker employees cavalierly told racist jokes and made offensive and disparaging comments at work. Burton intimated that his supervisors pulled him off the collections floor and forced him to take a drug test solely to humiliate him in front of his coworkers. He also recounted an incident in which he reported one of his co-managers for becoming involved in a

relationship with one of the manager's employees and showing unfair favoritism to that employee. Zwicker ultimately fired Burton over what appears to have been a very trivial bit of misconduct. However, the most important incident for the purposes of this appeal arose out a sex discrimination suit that several ex-employees filed against the law firm in 2009. Zwicker's outside counsel began investigating the suit. As a part of that investigation, Zwicker's lawyers conducted interviews with potential witnesses, including Burton. The lawyers interviewed Burton several times. In each of these interviews, Burton made statements that supported the former employees. Apparently Burton's support of the plaintiffs irked Zwicker's management. Several of Burton's supervisors approached him and suggested that his staunch support of the former employees was a bad idea. For example, after Burton finished speaking with the lawyers, one supervisor told Burton he needed to make better choices, and another told him that his job was in jeopardy. However, Burton never testified that anyone at Zwicker came right out and directly told him to lie to the outside lawyers. Furthermore, the interviews appear to have been preliminary fact finding efforts. There is no evidence that Zwicker ever asked Burton to make a statement under oath.

Burton and four other employees sued Zwicker for violating the Kentucky Civil Rights Act in state court in September 2010. Burton also brought a wrongful discharge claim. Burton's theory was that one of the reasons Zwicker fired him was because he refused to perjure himself in the discrimination case. Such a theory is cognizable because Kentucky employers cannot fire an employee for refusing to violate Kentucky public policy, which includes terminating the employee for refusing to commit a crime. Zwicker removed the case to federal court.

The parties conducted extensive discovery, litigated two summary judgment motions, and finally went to trial in April 2013. The jury found that Zwicker terminated Burton because of his

race, in retaliation for his engaging in protected activity, and because Burton refused to perjure himself.  The jury awarded Burton $300,000 in back pay and $50,000 for mental distress due to the wrongful termination.  It further awarded $50,000 for mental distress caused by Burton's working in a hostile racial environment.  Finally, it granted $600,000 in punitive damages because Zwicker fired Burton for refusing to commit perjury.

The parties filed several post-trial motions that are at issue in this appeal.  Zwicker filed a motion for judgment as a matter of law and for a new trial and alternatively requested that Burton's damages be reduced.  Burton filed a motion requesting additional relief in the form of reinstatement and front pay.

The district court denied Zwicker's motion for judgment as a matter of law.  The court concluded that Burton's testimony about his refusal to change his story despite pressure from his supervisors adequately supported the jury's verdict on the public policy claim.  The court rejected Zwicker's argument that an employee must actually be in a position to commit perjury (i.e., be under oath) for the employer to be liable for a violation of public policy.

The district court agreed with Zwicker that the jury's award of $600,000 in punitive damages violated due process.  The court walked through the Supreme Court's *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) analysis and concluded that due process required reducing the punitive damages award to $350,000, i.e., a 1:1 punitive to compensatory damages ratio.  The district court refused to reduce Burton's compensatory damages, however.  Zwicker argued that the jury must have failed to consider the damages Burton mitigated by obtaining post-termination employment when it arrived at a calculation of $300,000 in back pay.  The court refused to set aside the award on these grounds because Zwicker failed to prove how much

-4-

Burton had earned in those positions. In other words, while the jury knew that Burton had been working after he was fired from Zwicker, it did not know how much Burton earned.

The district court refused to grant Burton's motion for reinstatement and front pay. It held that reinstatement would be inappropriate because there was evidence that racism was pervasive at Zwicker and that Burton would likely continue to experience hostility if he were to return. The court also refused to award front pay because the only evidence Burton presented was his salary from the last five months he worked at Zwicker. The court concluded that any award of front pay based on this bare-bones evidence would have been too speculative.

Both parties appeal. Zwicker appeals the district court's refusal to grant judgment as a matter of law against Burton on his public policy claim and its refusal to reduce Burton's compensatory damages. Zwicker also argues that the punitive damages award should either fail entirely along with the public policy claim or the award should be further reduced because the modified award still violates due process. Burton on the other hand appeals the district court's modification of the jury's punitive damages award and the court's refusal to grant reinstatement and front pay. We address Zwicker's appeal first, and Burton's appeal second.

## Zwicker's Appeal

### 1. Public Policy Claim

Although the question is close, Burton presented enough evidence for the jury to conclude that his termination violated Kentucky public policy. In Kentucky, "an employer may discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983). But the Kentucky courts have created an exception to this general rule. An employer cannot discharge an employee for a reason "contrary to a fundamental and well-defined public

policy as evidenced by existing law." *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985). Well-defined public policy includes the Commonwealth's criminal laws. This means that an employer cannot fire an employee because the employee refuses to commit perjury, which is a crime in Kentucky. *See N.E. Health Mgmt., Inc. v. Cotton*, 56 S.W.3d 440, 447 (Ky. Ct. App. 2001).

Based on Burton's testimony, a jury could have concluded that Burton's supervisors asked him to commit perjury in violation of Kentucky public policy. At trial, the jury heard the following testimony:

> Q. Did you support the company's position in [the sex discrimination lawsuit], or did you give [Zwicker's lawyers] some information that supported the Employees?
>
> A. Oh, I gave them information that supported the employees.
>
> . . .
>
> Q. And how did the company react to your information you were providing to the company's lawyers?
>
> A. They were not happy about it and they began to make comments, explain their displeasure for me taking the support of these employees.
>
> Q. All right. Now, you say "they." How about Jamie Walker; did she say anything to you about it?
>
> A. Absolutely.
>
> Q. What did she say?
>
> A. In one exchange, Jamie Walker was actually in there with the attorneys, and she was finishing or they were talking. And so it was my turn, and they were calling me in, and Jamie Walker stated to me, she said, "Clinton, you can tell the truth. You won't lose your job."
>
> Q. Were you telling the truth in the first place?
>
> A. Absolutely.
>
> Q. Was another individual you spoke to about this or who spoke to you was John Twite?

A. Correct.

. . .

A. . . . And he stated to me, "Hey Clinton, you need to make better choices. You need to make better decisions."

Q. Make better choices. And this was after you had met with lawyers?

A. Three to five times, being badgered, berated.

. . .

Q. And did [Mike Koziol] speak with you about your—the information you were giving to the lawyers?

A. He did.

Q. What did he say?

A. He said that I made poor judgment and that my job was in jeopardy.

Based on this testimony, the jury could have concluded that Burton's supervisors asked him to perjure himself even though the supervisors did not actually use the term "perjury" or tell Burton to "lie under oath." In the right context, the words "tell the truth" and "you won't lose your job" could easily be understood to mean "lie if you don't want to get fired." Similarly, being told to "make better choices" could mean "change your tune or else . . . ." The jury could also have concluded that Mike Koziol delivered a thinly veiled threat when he told Burton his job was "in jeopardy." The jury could have reasonably concluded that both Zwicker and Burton understood the meaning of these statements: either Burton could toe the Zwicker line or start looking for a new job.

Zwicker disagrees with this reasoning and argues that an employer must make an affirmative request that the employee commit a crime. However, a request is still affirmative if

both the employer and employee understand that the employer is asking the employee to commit a crime even if the employer asks in a roundabout way. It should not be surprising that an employer would not come right out and command an employee to "commit perjury," but rather would choose to make the request in a more subtle way.

Zwicker also argues that there was insufficient evidence because Burton was never under oath. It is of course true that Burton could not commit perjury unless he was eventually placed in a position where he could make a statement under oath. But Kentucky law does not require that the actual criminal act occur for an employee to have a public policy claim. Rather, an employer must only request that the employee break the law. In *Cotton*, the plaintiffs' supervisor faced shoplifting charges, and the plaintiffs were asked to testify falsely to help bolster the supervisor's defense. 56 S.W.3d at 443. The employees refused, the case proceeded to trial, and the supervisor was eventually convicted. *Id.* at 444. Because the employees never testified, they were never under oath. Nevertheless, the Court of Appeals held that the plaintiffs had a viable public policy claim because their employer requested that the employees commit perjury.

This case is not on all fours with *Cotton* because it was arguably more likely that the plaintiffs in that case would have been placed under oath. There, the supervisor actually asked the employees to testify. Here, Burton's interview with Zwicker's lawyers was more preliminary: the lawyers never requested that Burton sign an affidavit, testify, or otherwise make a statement under oath. But, the district court could only grant judgment as a matter of law in Zwicker's favor "if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720

(6th Cir. 2004) (internal quotation marks omitted).  Burton testified that he was "identified by the company as a potential witness in [the sex discrimination] case."  Based on that testimony, the jury could reasonably conclude that the purpose of the interviews was to evaluate what Burton would say if he testified.  The jury could further infer that Burton would know that he would be expected to tell the same story under oath as he did in the preliminary interview.  Thus by encouraging Burton to lie in the first interview, Zwicker was in effect asking Burton to agree to lie when he was eventually called as a witness.  The employees in *Cotton* were in the same basic position.  If the employees had caved to pressure from their supervisor and agreed to testify falsely, they would not have committed perjury either.  Rather they would have simply conveyed their willingness to tell a certain story when they were eventually called as witnesses.  In both cases, the employee's ability to actually commit perjury was contingent on the employee's being placed under oath.  The fact that the contingency was arguably less likely to occur in this case than in *Cotton* does not justify disregarding the jury's finding.

The other cases Zwicker cites do not support its position because they do not involve illegal conduct.  For example, *Chavez v. Dakkota Integrated Sys., LLC*, 832 F. Supp. 2d 786, 803 (W.D. Ky. 2011) involved an employee who objected to installing airbags that had fallen from a forklift into instrument panels that were to be installed in Ford trucks.  *Id.* at 790–91.  The employee argued that installing these airbags would violate two of Kentucky's consumer protection laws.  *Id.* at 802.  But the *Chavez* court concluded that there was no evidence that using the airbags would violate the relevant statutes.  Thus the plaintiff in *Chavez* lost because he failed to show that installing the airbags would violate the Commonwealth's consumer protection laws.  *Id.*  By contrast, perjury is without a doubt illegal.  Our decision in *Merkel v. Scovill, Inc.*, 787 F.2d 174 (6th Cir. 1986), which applied Ohio law, is also distinguishable.  That case

involved an employer that requested that its employee sign an affidavit. *Id.* at 180. The employee argued that the affidavit contained false statements. But the evidence presented at trial indicated that the employee's supervisor believed that the affidavit was accurate. *Id.* Thus the evidence in *Merkel* did not support a public policy claim because there was no indication that the employer requested that the employee lie. By contrast, the jury in this case heard testimony which indicated that Burton spoke truthfully to the lawyers, but that Zwicker management still pressured him to change his story, i.e., lie. While we might come to a different conclusion on the cold record, the jury actually heard the testimony of the witnesses in this case where nuance may make all the difference. Zwicker does not challenge, moreover, the content of the jury instructions.

The jury thus believed that Burton's refusal to agree to commit perjury caused Zwicker to fire Burton, and the company points to nothing that justifies disregarding that conclusion. Zwicker also argues that Burton failed to show causation between his termination and his refusal to commit perjury. Zwicker notes that the interviews with outside counsel happened well before Burton was fired and thus argues that Burton failed to establish causation. In support of this argument, Zwicker cites several of this court's decisions that have held that mere temporal proximity without additional evidence is usually insufficient to establish causation in a federal retaliation claim. *See, e.g.*, *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010); *Williams v. Zurz*, 503 F. App'x 367, 372 (6th Cir. 2012). However, Kentucky courts appear to use a more generous causation standard. To make a public policy claim under Kentucky law, "a plaintiff must show at a minimum that he engaged in a statutorily protected activity, that he was discharged, and that there was a connection between the protected activity and the discharge." *Mitchell v. Coldstream Labs., Inc.*, 337 S.W.3d 642, 645 (Ky. Ct. App.

2010) (internal quotation marks omitted). Kentucky courts have found that a connection exists between a protected activity and a subsequent discharge even when a substantial amount of time has passed. For example, in *Follett v. Gateway Reg'l Health Sys. Inc.*, 229 S.W.3d 925 (Ky. Ct. App. 2007), Gateway claimed that it fired Follett, who was the Director of Nursing at a hospital, because she decided to give nurses a raise in February 2003. *Id.* at 927. However, Follett had reported a doctor for drinking on the job in February 2002 and billing irregularities in January 2003. *Id.* at 930–32. The Court of Appeals found that a jury could conclude that the real reason the hospital terminated Follett was her reports and not her decision to give the nurses a raise. *Id.* at 932. Similarly, the *Cotton* court affirmed a jury verdict for a public policy claim even though the supervisor asked her employees to perjure themselves in April 1995 and forge a document in May 1996, but the employees were not forced to resign until October 1996. 56 S.W.3d at 444. The *Cotton* court explicitly addressed the passage of time between the perjury request and the termination:

> The hospital seems to argue that because Cotton and Howell worked for more than a year after Dennis requested them to perjure themselves that their claims of retaliation are unlikely and unbelievable. Unfortunately for the hospital, the jury sided with Cotton and Howell and the hospital has not cited any support for its contention that this lapse in time has any legal significance.

*Id.* at 447. As in *Cotton*, there is not enough reason to disregard the jury's finding here. The district court accordingly did not err in refusing to grant Zwicker's motion for judgment as a matter of law.[1]

**2. Back Pay**

Zwicker's challenge to the jury's award of back pay is without merit. "We review back pay awards for an abuse of discretion." *Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d

---

[1] Zwicker also argued that the award of punitive damages should fail entirely along with Burton's public policy claim. That argument fails because Burton presented enough evidence to support his public policy claim.

1228, 1233 (6th Cir. 1996). The law firm argues that the district court erred in allowing the jury's award of $300,000 in back pay to stand because there was evidence in the record that Burton found other employment after he was fired and that the jury's award did not account for the money Burton earned in those positions. Burton testified that he made approximately $46,000 in the first five months of 2010. Zwicker terminated Burton in May 2010, and the parties went to trial in April 2013. Assuming that these earnings were representative of Burton's typical monthly salary, Burton was entitled to a maximum of approximately $322,000 in back pay ($46,000 / 5 = $9,200 x 35 = $322,000). The jury's award of $300,000 was thus supported by evidence presented at trial and was therefore a permissible award. *See Jackson v. City of Cookeville*, 31 F.3d 1354, 1359 (6th Cir. 1994).

Zwicker argues that a reasonable jury could not have arrived at this figure because Burton admitted that he held several jobs between May 2010 and the trial. Burton testified that he worked at ACB, Citibank, Green & Cooper, and Alliance Data after he was fired from Zwicker. According to Zwicker, Burton was employed for thirty months total. Zwicker argues that Burton was only entitled to back pay of approximately $46,000, i.e., his salary from Zwicker for the five months he was unemployed. But this ignores the possibility that Burton made less in his subsequent positions then he did at Zwicker. Simply proving that a plaintiff was employed is not the same thing as showing how much the plaintiff earned. Generally, an award of back pay should be offset by the plaintiff's earnings from other jobs. *See Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 521 (6th Cir. 2009). However, "the burden . . . falls on the wrongdoer to show that the damages were lessened or might have been lessened by the plaintiff." *Jones v. Consol. Rail Corp.*, 800 F.2d 590, 593 (6th Cir. 1986). "Once a claimant establishes a prima facie case and presents evidence on the issue of damages, the burden of producing sufficient evidence to

establish the amount of interim earnings . . . shifts to the defendant." *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 623 (6th Cir. 1983). Zwicker did not present any evidence about Burton's interim earnings. Zwicker only established that Burton was employed. In fact, the district court and the parties discussed the absence of salary evidence during the jury charge conference. In an attempt to correct the problem, the district court offered to reopen the case to allow the parties to offer evidence about Burton's post-termination earnings. However, Zwicker declined to take that opportunity. Without evidence of Burton's earnings in these positions, it is impossible to say that the jury's award was not supported by evidence presented at trial or that the district court abused its discretion in refusing to modify the award. Zwicker may well be correct that the jury's award of $300,000 did not accurately reflect Burton's mitigation efforts. But the law firm has only itself to blame for the jury not taking Burton's post-termination earnings into account.

**3. Punitive Damages**

The district court's modified award of $350,000 in punitive damages complied with due process, and the district court did not err by failing to further reduce Burton's punitive damages. Originally, the jury awarded Burton $600,000 in punitive damages. After trial, Zwicker argued this award violated due process. The district court agreed and reduced the punitive damages to $350,000. The district court arrived at this figure because it concluded that a 1:1 ratio of punitive to compensatory damages was appropriate given the facts of the case. Courts look to three "guideposts" when evaluating the constitutionality of a punitive damages award: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference

between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

The district court properly concluded that Zwicker acted with intentional malice. The Supreme Court has called reprehensibility "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. Courts evaluate reprehensibility based on whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419.

In this case, the jury finding itself indicates that Zwicker acted with intentional malice. The jury found that Zwicker fired Burton in retaliation for his refusing to commit perjury, which certainly implies that Zwicker acted with some intentional malice. In *Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 486 (6th Cir. 2007), we reasoned that the intentional malice factor was supported by the fact that "[t]he jury concluded that the defendants acted 'willfully.'" In that case, which involved copyright infringement, the inference of malice from the jury finding of willfulness was not a strong one, but it nonetheless led us to conclude that the "defendants' conduct was still somewhat reprehensible." *Id.* The same is true here; indeed, firing a particular employee for refusing to commit perjury is if anything more malicious than copyright infringement. This is not to say that any jury verdict for an intentional tort necessarily supports punitive damages, but instead only that an intentional injury in a context such as this supports the reprehensibility guidepost for assessing punitive damages.

The district court also did not err in setting punitive damages at $350,000 based on a 1:1 ratio of punitive to compensatory damages. While no bright-line rule exists, the Supreme Court has explained that awards of punitive damages that significantly exceed a plaintiff's compensatory damages will rarely be upheld. *See State Farm*, 538 U.S. at 425. Zwicker does not object to the district court's decision to use a 1:1 ratio. Rather, it disagrees with the district court's use of $350,000 as the compensatory damages figure in that 1:1 ratio. It bases this argument on the fact that Burton could only receive punitive damages for his public policy claim. *See Simpson Cnty. Steeplechase Ass'n, Inc. v. Roberts*, 898 S.W.2d 523, 526 (Ky. Ct. App. 1995). Zwicker contends that the calculation of punitive damages should be pegged to the compensatory damages that correspond to the public policy claim and that inflating the compensatory damages figure with damages that stem from other causes of action would be improper. The problem with this argument is that Burton's damages were the same for all of the causes of action involving wrongful termination. The jury concluded that Zwicker wrongfully terminated Burton on several different theories. It concluded that Zwicker fired Burton because of his race, because Burton engaged in a protected activity, and because Burton refused to commit perjury. Each of these theories required the jury to conclude that a different kind of wrongful conduct had occurred. But the result of the wrongful conduct was the same under each theory: Burton was fired for an improper reason. The harm Burton suffered under each of these theories is the same. Burton's wrongful termination caused him to incur damages because he was no longer receiving a salary from Zwicker and caused him to suffer mental distress. Zwicker's argument is thus incorrect as a factual matter: the jury in effect concluded that Burton suffered $350,000 in compensatory damages because he was terminated in violation of Kentucky public policy because Burton's damages were the same for all three theories of the case.[2] The

---

[2] It is notable that the jury also awarded Burton $50,000 for "emotional and mental distress resulting from [a] hostile

district court did not err by modifying Burton's punitive damages award to $350,000 based on a 1:1 ratio of punitive to compensatory damages.

### Burton's Appeal

**1. Punitive Damages**

Given the attenuated egregiousness of Zwicker's conduct and the jury's large award of compensatory damages, the district court properly reduced the jury's award of punitive damages. While the district court's reduction of the original award of punitive damages from $600,000 to $350,000 was discussed above, Burton also appeals that decision. Unsurprisingly, Burton's arguments are much different than Zwicker's. Burton's position is that the jury's original award of $600,000 complied with due process and the district court's modification of the award was improper. Burton argues that the district court should have found that he was financially vulnerable and that Zwicker engaged in repeated conduct. Because these additional factors were present, Burton contends that Zwicker's conduct was reprehensible enough to justify the original award. While Burton is correct that he exhibited some financial vulnerability, Zwicker's conduct still was not reprehensible enough to justify more than $350,000 of punitive damages.

Despite his salary, Burton did exhibit some financial vulnerability. The district held that Burton was not financially vulnerable because Burton earned over $100,000 a year at Zwicker. It is true that this was a relatively large salary. However, financial vulnerability exists on a spectrum. By way of illustration, in *Morgan v. N.Y. Life Ins. Co.*, 559 F.3d 425, 441 (6th Cir. 2009), this court held that the managing partner at an insurance company who made a base salary of $500,000 to $1,000,000 per year was not financially vulnerable. The *Morgan* court also

---

racial environment." This claim had to with the racist jokes and statements Burton endured while working at Zwicker. The harm Burton suffered due to the hostile work environment was distinct from the termination. Apparently in recognition of this fact, the district court did not include the $50,000 in compensatory damages that the jury granted for the hostile work environment in the $350,000 figure for purposes of calculation of the ratio of punitive damages.

factored in the jury's award of $6,000,000 in compensatory damages in considering Morgan's financial vulnerability. Burton made much less than Morgan and was awarded much less in the way compensatory damages. Thus, Burton was clearly more financially vulnerable than Morgan. By contrast, in *Bach v. First Union Nat'l Bank*, 149 F. App'x 354 (6th Cir. 2005), a "seventy-seven year old retired widow" who "possesse[d] assets totaling approximately $224,000.00 and ha[d] a monthly income of approximately $1,800.00" was conceded by the defendant to be financially vulnerable. *Id.* at 356, 365. Burton is much younger than the plaintiff in *Bach*, had a higher monthly income, and has the potential to earn for many more years. Burton is less financially vulnerable than the plaintiff in *Bach*. Burton falls somewhere in between these two cases, and thus the financial vulnerability factor does not weigh strongly either way.

Zwicker's conduct was not repeated. "The repeated conduct factor requires that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with the plaintiff." *Bridgeport*, 507 F.3d at 487 (internal quotation marks and alterations omitted). While Zwicker's lawyers interviewed Burton several times, all of those interviews related to the same case. There is no other evidence that Zwicker tried to convince its other employees to commit perjury and fired them for failing to do so. Burton does not meet (nor does he argue that he meets) any of the other factors. He suffered no physical harm, and Zwicker's conduct did not pose a risk to the health of safety of others.

The attenuated level of reprehensibility of Zwicker's conduct means that Burton's award of punitive damages must be relatively modest to comply with due process. In *Bridgeport*, this court held that "where only one of the reprehensibility factors [was] present," "a ratio [of compensatory to punitive damages] of 1:1 to 2:1 is all that due process will allow." *Id.* at 487.

While two factors are present in this case, neither factor is particularly strong. Thus Zwicker's conduct was only somewhat reprehensible.

Given the jury's large award of compensatory damages, an award of punitive damages at a 1:1 ratio of punitive to compensatory damages was appropriate. Originally, the jury granted Burton punitive damages at a ratio of approximately 1.7:1. Burton argues that this ratio was appropriate because the Supreme Court has held that higher ratios were consistent with due process and because this court's *Bridgeport* decision suggested that a 2:1 ratio would be appropriate in a case where the defendant's conduct was only mildly reprehensible. However, this case involves a large award of compensatory damages. While the Supreme Court has been hesitant "to impose a bright-line ratio which a punitive damages award cannot exceed," it has said that "few awards exceeding a single-digit ratio to a significant degree will satisfy due process." *State Farm*, 538 U.S. at 424–25. The Court has furthered explained that a higher ratio may be appropriate in cases where a defendant's conduct is egregious and the plaintiff's economic damages are relatively low. *Id.* at 425. But the converse is also true: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* at 425. In *State Farm*, the Supreme Court reasoned that an "award at or near the amount of compensatory damages" was required "in light of the substantial compensatory damages awarded." *Id.* at 429. This court applied that reasoning in *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 153 (6th Cir. 2007). That case involved a jury award of $400,000 in compensatory damages and $2.2 million in punitive damages. The *Bach* court held that the jury's award "closely mirrors the hypothetical scenario described in *State Farm*," and thus a 1:1 ratio was appropriate. *Id.* at 156. Considering

the similarity of the compensatory damages awards in this case and *Bach*, limiting the ratio to 1:1 was proper.

**2. Reinstatement**

The district court did not err in refusing to reinstate Burton. On cross examination, Burton testified that "almost all members of [Zwicker] management showed some type of racial animus or harbored ill feelings toward me." Burton also had job at Alliance Data at the time of trial. "[W]hile reinstatement should be granted in the ordinary case . . . , it is an equitable remedy which is not appropriate in every case, such as where the plaintiff has found other work, . . . or where hostility would result. *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993). Burton had another job, and the district court reasonably concluded that hostility would result if Burton returned to the Zwicker work environment. The district court acted within its discretion in refusing to grant reinstatement.

**3. Front Pay**

The district court also did not err in refusing to award Burton front pay because Burton failed to introduce evidence that the district court could use to craft a reasonably certain award. Under federal law,[3] "[a] plaintiff who seeks an award of front pay must provide the district court with the essential data necessary to calculate a reasonably certain front pay award." *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 407 (6th Cir. 2003). At trial, the only evidence that Burton offered was that he made approximately $46,000 in the first five months of 2010. Simply proving one's salary is not enough. This court has explained that

> awards of front pay must be guided by consideration of certain factors, including an employee's duty to mitigate, the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present

---

[3] The Kentucky courts appear to generally follow federal law in this area. *See, e.g.*, *Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 920–21 (Ky. Ct. App. 2006).

value of future damages and other factors that are pertinent on prospective damage awards.

*Roush*, 10 F.3d at 399 (internal quotation marks omitted). Burton failed to offer evidence of any of these factors.

In particular, Burton needed to offer at least some evidence that could be used to impose a temporal limit on an award of front pay. "The cut-off date for the [front pay] award is within the discretion of the district court . . . yet evidence must be submitted from which a reasonable projection can be made. Such an estimation must involve more than mere guesswork." *Shore v. Fed. Express Corp.*, 777 F.2d 1155, 1160 (6th Cir. 1985); *see also Peyton v. DiMario*, 287 F.3d 1121, 1129 (D.C. Cir. 2002). Burton has not pointed to any evidence that the district court could have used to determine a cut-off date. Burton responds that awards of front pay are inherently speculative. But while Burton need not have paraded a team of economists in front of the judge to meet his burden of proof, he had to provide at least some evidence that the district court could have used to establish a reasonable limit on the duration on the award. Without some basis for imposing a limit on the award, any award of front pay by the district court would have been a stab in the dark.

While courts generally award front pay when reinstatement is inappropriate, *Suggs*, 72 F.3d at 1234, refusing to do so is permissible. A plaintiff "is not automatically entitled to front pay." *Upchurch*, 214 S.W.3d at 920. In *Upchurch*, a Kentucky court denied reinstatement because the plaintiff failed to request it as a remedy, and denied front pay because the plaintiff stopped actively seeking employment after being terminated. *Id.* at 920–21. *Upchurch* makes it clear that awards of front pay are not always required under Kentucky law. Burton failed to carry his burden of proof on this issue, and the district court did not err in denying front pay.

For the foregoing reasons, we AFFIRM the judgment of the district court.