Sharon **FOLLETT**, Appellant

v.

**GATEWAY REGIONAL HEALTH SYSTEM, INC.; and Patrick Romano, Appellees.**

No. 2006–CA–000855–MR.

Court of Appeals of Kentucky.

July 20, 2007.

Albert F. Grasch, Jr., Theodore E. Cowen, Elizabeth K. Mitchell, Lexington, KY, for appellant.

Stephen E. Neal, Mt. Sterling, for appellees.

Before THOMPSON and VANMETER, Judges; PAISLEY,[1] Senior Judge.

---

1. Senior Judge Lewis G. Paisley sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Ken-

## OPINION

VANMETER, Judge.

Sharon Follett appeals from the Montgomery Circuit Court's order granting summary judgment in favor of Gateway Regional Health System, Inc. (Gateway) and its CEO, Patrick Romano, on Follett's claim of wrongful discharge. For the following reasons, we vacate the circuit court's order and remand for further proceedings.

In late February 2003, Romano met with Follett, then the Director of Nursing at Mary Chiles Hospital, and expressed that her decision to give raises to nurses was without authority and was a gross act of insubordination. After emphasizing that he ran the hospital, Romano gave Follett a memo which stated:

Effective immediately your employment as our Director of Nursing is terminated.

This termination is the result of insubordination and defiance of supervisory authority, as demonstrated in your repeated inappropriate decision-making outside the chain of command. It is also the result of our decision to eliminate your position in the hospital.

Thereafter, Follett filed a complaint alleging that she was wrongfully discharged for her actions regarding two situations which occurred at the hospital during the year prior to her discharge. The first situation involved her reporting suspicions that an emergency room doctor was under the influence of alcohol while on duty. The other situation involved her involvement in reporting suspected emergency room billing irregularities at the hospital. Based on all of the evidence, the circuit court granted summary judgment in favor

of Gateway and Romano, and dismissed Follett's claims. This appeal followed.

## I. Exceptions to Terminable-at-Will Doctrine

Under Kentucky law, an employer may ordinarily "discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div., Firestone Tire and Rubber Co. v. Meadows,* 666 S.W.2d 730, 731 (Ky.1983). There is a narrow public policy exception to this "terminable at-will" doctrine, however, whereby an

employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law.... The public policy must be evidenced by a constitutional or statutory provision. An employee cannot be fired for refusing to violate the constitution or a statute.

*Id.* (quoting *Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 335 N.W.2d 834, 840 (1983)). Whether a public policy is fundamental, well-defined, and evidenced by existing law is a question of law for the courts to decide. *Grzyb v. Evans,* 700 S.W.2d 399, 401 (Ky.1985).

Here, Follett asserts that she was discharged for refusing to violate KRS 311.990(6), which provides:

Conviction of willfully resisting, preventing, impeding, obstructing, threatening, or interfering with the [State Board of Medical Licensure, KRS 311.550(1),] or any of its members, or of any officer, agent, inspector, or investigator of the board or the Cabinet for Health and Family Services, in the administration of any of the provisions of KRS 311.550 to 311.620 shall be a Class A misdemeanor.

tucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

As Follett alleges that she was discharged for refusing to violate this statute, she has based her claim on the exception to the employment-at-will doctrine whereby an employee cannot be discharged for refusing to violate a statute.

Next, Follett relies upon KRS 205.8465 as a basis for her wrongful discharge claim. KRS 205.8465(1) requires that any person, who knows or has reasonable cause to believe that a violation of KRS Chapter 205 has been or is being committed, shall report or cause to be reported certain information to the state Medicaid Fraud Control Unit, or the Medicaid Fraud and Abuse hotline. Further, KRS 205.8453 makes the Cabinet for Health and Family Services and the Department for Medicaid Services responsible for controlling provider fraud and abuse. KRS 205.8451(2) defines fraud as

> an intentional deception or misrepresentation made by a recipient or a provider with the knowledge that the deception could result in some unauthorized benefit to the recipient or provider or to some other person.

Finally, KRS 205.8465(3) provides as follows:

> No employer shall, without just cause, discharge or in any manner discriminate or retaliate against any person who in good faith makes a report required or permitted by KRS 205.8451 to 205.8483, testifies, or is about to testify, in any proceeding with regard to any report or investigation. Any individual injured by any act in violation of the provisions of this subsection shall have a civil cause of action in Circuit Court to enjoin further violations, and to recover the actual damages sustained, together with the costs of the lawsuit, including a reasonable fee for the individual's attorney of record.

As Follett alleges that she was discharged contrary to this explicit legislative statement prohibiting the discharge of employees in certain situations, she has based her claim upon an exception to the employment-at-will doctrine. *See Grzyb,* 700 S.W.2d at 402.

## II. Summary Judgment Standard

We now turn to whether Follett has alleged facts sufficient to withstand summary judgment in favor of Gateway and Romano. In considering a summary judgment motion, the circuit court must view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476, 480 (Ky.1991). "Even though a trial court may believe the party opposing the motion may not succeed at trial, it should not render a summary judgment if there is any issue of material fact." *Id.* On appeal, the standard of review "is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft,* 916 S.W.2d 779, 781 (Ky.App.1996).

## III. Wrongful Discharge Claim

Follett argues that the burden-shifting analysis set forth in *Kentucky Department of Corrections v. McCullough,* 123 S.W.3d 130 (Ky.2003), is applicable. The plaintiff in *McCullough* alleged gender discrimination and unlawful retaliation in violation of the Kentucky Civil Rights Act. As such, Follett's wrongful discharge claim is similar to, but distinct from, McCullough's claim. *See First Property Management Corp. v. Zarebidaki,* 867 S.W.2d 185, 188 (Ky.1993); *Bishop v. Manpower, Inc. of Central Ky.,* 211 S.W.3d 71, 75 (Ky.App. 2006); 2 John S. Palmore, *Kentucky Instructions to Juries (Civil),* § 51.01

("Wrongful Discharge from Employment") and § 53.01 ("Civil Rights: Discharge from employment; sex discrimination") (4th Ed.1989 & Cum.Supp.2005).

■ As opposed to the burden set forth in *McCullough,* in a non-civil rights wrongful discharge case such as this, a plaintiff must show "at a minimum that he was engaged in a statutorily protected activity, that he was discharged, and that there was a connection between the 'protected activity' and the discharge." *Willoughby v. GenCorp, Inc.,* 809 S.W.2d 858, 861 (Ky.App.1990). More specifically, the third prong requires a plaintiff to show the protected activity was "a substantial and motivating factor but for which the employee would not have been discharged." *Zarebidaki,* 867 S.W.2d at 188. As there is rarely a case where a plaintiff has a "smoking gun" to prove improper motive, a plaintiff must frequently "rely on circumstantial evidence and the inferences that can be drawn therefrom to make his or her case." *Willoughby,* 809 S.W.2d at 861.

### A. Was Follett Engaged in Statutorily–Protected Activities?

As set forth above, either KRS 311.990(6) or KRS 205.8465 may form the basis for a wrongful discharge claim. The question now becomes whether genuine issues of material fact exist as to whether Follett was engaged in the activities described in either of these statutes.

■ Again, KRS 311.990(6) makes it a Class A misdemeanor to impede a State Board of Medical Licensure investigator "in the administration of any of the provisions of KRS 311.550 to 311.620[.]" Further, KRS 311.595 authorizes the Board to, inter alia, suspend, limit, restrict, or revoke the medical license of a licensee who either engages in unprofessional conduct likely to harm the public, or becomes a chronic or persistent alcoholic. Here, Follett alleges that she told a Board of Medical Licensure investigator that there had been previous suspicions that an emergency room physician was under the influence of alcohol while on duty. Thus, it seems that there are genuine issues of material fact as to whether Follett was engaged in a statutorily-protected activity when she spoke truthfully to the investigator, as failure to do so would have resulted in her violation of KRS 311.990(6).

■ Next, as set forth above, KRS 205.8453 makes the Cabinet for Health and Family Services and the Department for Medicaid Services responsible for controlling provider fraud and abuse. KRS 205.8465(3) prohibits an employer from discharging an employee who, inter alia, in good faith makes a report required or permitted by KRS 205.8451 to 205.8483. Further, KRS 205.8465(1) requires that any person who knows or has reasonable cause to believe that a violation of KRS Chapter 205 has been or is being committed must report or cause to be reported certain information to either the state Medicaid Fraud Control Unit, or the Medicaid Fraud and Abuse hotline. Here, Follett testified that she advised members of her staff to report either directly to Medicaid, or to the hospital's corporate compliance officer, their suspicions of billing irregularities in the hospital's emergency room. More specifically, Follett testified that her staff members told her some doctors

would be documenting on charts of patients that they had not seen, not that they were making it up. But, there would be charts there that a doctor had seen the patient and he would write a brief note, but he may not be coming back there to work for another month or two. So, rather than hold that until he came back to finish it, they would look at

that and go ahead and fill it out even though they, themselves, did not directly see the patient.

Thus, genuine issues of material fact exist as to whether Follett was engaged in a statutorily-protected activity when she advised her staff members to report the matter.

## B. Was Follett Discharged?

It is undisputed that Follett was discharged.

## C. Has Follett Shown a Connection Between Her Protected Activity and Her Discharge?

■ Considering all of the circumstances, Follett has alleged facts to establish a sufficient connection between her protected activity and her discharge, with the result that the circuit court erred by granting summary judgment against her.

Follett alleges with regard to the physician issue that in March 2002, she received complaints from nurses who suspected that they smelled alcohol on Dr. Robert Gevedon's breath while he was on duty at the hospital. Follett reported the complaints to her supervisor, Christine McIntyre, as well as to Paula Pryor, the Chief Operating Officer of Marshall Emergency Services Associates (MESA), the entity with which Dr. Gevedon was associated. McIntyre and Pryor instructed Follett to assign a nurse to the night shift to look out for any more suspicious behavior. When the assigned nurse subsequently suspected Dr. Gevedon was intoxicated at work, Follett again contacted McIntyre and Pryor. Gevedon's blood was drawn, but the sample was discarded due to perceived prob-

lems with its chain of custody.[2] Despite Follett's suggestions, a second blood test was not conducted and the matter was not reported. Instead, a meeting was held several days after the incident among some members of the hospital administration. Follett was not invited to the meeting despite the fact that she had asked to be included and was one of the only administrators present at the hospital at the time of the incident. McIntyre assured Follett that she had conferred with MESA personnel, Dr. Gevedon would not return to work at the hospital, and he was entering a rehabilitation program. When Dr. Gevedon nevertheless returned to the hospital in April 2002, McIntyre told Follett that he had completed alcohol rehabilitation or was being treated on an outpatient basis.

Thereafter in December 2002, a Board of Medical Licensure investigator visited the hospital's emergency room to review a narcotics log. The investigator spoke with Dr. Gevedon and suspected that he was intoxicated. Tests confirmed that Dr. Gevedon's blood alcohol level was .107%. During a subsequent meeting among the investigator, Follett, Romano, and a MESA doctor, Romano and the MESA doctor denied that there had been any previous alcohol-related incidents at the hospital involving Dr. Gevedon. After the meeting, however, Follett informed the investigator that in fact there had been prior reports, and the investigator confirmed that other employees had told him the same thing.[3] After the investigator again met with Romano and other members of the hospital administration, he thanked Follett for her cooperation and alluded to

---

**2.** The testimony is unclear as to why the blood's "chain of custody" was improper.

**3.** Indeed, Amy Brown testified that when she told the investigator of the prior reports subsequent to his meeting with Follett, he told

her that the MESA doctor and Romano had indicated otherwise, but that the nursing staff "was the only staff that had been honest with him."

the fact that some members of the hospital administration continued to be evasive about the situation.[4]

With regard to the alleged billing irregularities, Follett testified that in January 2003 members of her staff advised her of apparent billing irregularities by MESA for emergency room services provided at the hospital. Follett testified that she told her staff they could report the matter to either the hospital's corporate compliance officer or directly to Medicare. The staff members chose to report the matter to the corporate compliance officer. There was testimony that when the billing irregularity issue was brought to McIntyre's attention, she immediately asked whether Follett was aware of the allegations. When an affirmative response was given, McIntyre allegedly responded with an expletive. The individuals present at the time relayed to Follett that they interpreted McIntyre's response as meaning that the administration either was scared of, and/or was "after" Follett.

Additionally, Amy Brown, a nurse at the hospital, testified that around the time Follett left for vacation in February 2003, McIntyre called Brown in for a meeting in McIntyre's office, where she asked whether Brown believed Follett was good at her job. Brown felt uncomfortable about this meeting because Follett no longer reported to McIntyre at this point, and McIntyre indicated that there were going to be some changes at the hospital but she would support the people who had been loyal to her.

Finally, Follett presented evidence from which a jury could disbelieve Romano's proffered reason for discharging her. Romano called Follett shortly before she was to leave on vacation in February 2003 and told her not to complete any additional pay raise[5] forms until they discussed the matter. When Follett returned from vacation, she received a memo from Romano echoing the sentiment:

> In the future, please review all pay increases with me prior to any discussion of the proposed increase with employees. "Budgeted pay increases" does not mean that they are automatically approved! The only exception would be merit increases that fall within the approved range.
>
> As you know, we are currently experiencing significant monthly variation against budget in several areas of nursing. Additional pay increases without some meaningful operational adjustments will only contribute to additional variances.

Follett testified that although she did not complete any additional pay adjustment forms, she was nevertheless discharged a couple of days after receiving this memo.

Follett testified further that she had authority to issue the pay adjustments pursuant to the clinical ladder program on which she and McIntyre had worked to obtain approval since late 2000. The clinical ladder was finally approved by Gateway's board of directors, including Romano, as part of the budget in late 2002. She also testified that she submitted the pay adjustment forms pursuant to McIntyre's order to implement the clinical ladder beginning in 2003, which involved meeting and discussing the plan with nurses, signing them up for the plan, and then sending

---

**4.** We take judicial notice that as a result of the investigation, Dr. Gevedon and the Kentucky Board of Medical Licensure entered an agreed order of indefinite restriction on his medical license. *In Re License of Gevedon*, Kentucky Board of Medical Licensure, Case No. 882 (June 23, 2004), *available at* http://www.state.ky.us/agencies/kbml/finalorders/29767.pdf.

**5.** Follett testified that Romano used the word "raise." She was adamant that she was giving "adjustments."

pay adjustment forms to human resources. Again, from this testimony, a jury could reasonably disbelieve Romano's proffered reason for discharging Follett.

Based upon all of this evidence, a jury reasonably could infer that Follett's involvement in reporting the billing irregularities, and her involvement in reporting the physician issue to the investigator, were substantial and motivating factors but for which Follett would not have been discharged. Thus, genuine issues of material fact exist as to whether she was wrongfully discharged.

The Montgomery Circuit Court's order granting summary judgment in favor of Gateway and Romano is vacated. This matter is remanded for reinstatement of the action and further proceedings.

ALL CONCUR.