NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0135n.06
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 02, 2017
DEBORAH S. HUNT, Clerk

BRUCE HOLLY,                                    )
                                                )
    Plaintiff-Appellant,                        )
                                                )
v.                                              )      ON APPEAL FROM THE
                                                )      UNITED STATES DISTRICT
UPS SUPPLY CHAIN SOLUTIONS, INC., AND           )      COURT FOR THE WESTERN
JEREMY FLETCHER,                                )      DISTRICT OF KENTUCKY
                                                )
    Defendants-Appellees.                       )
                                                )


BEFORE:    MERRITT, BATCHELDER, and ROGERS, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.**   In this wrongful termination suit, Plaintiff-Appellant Bruce Holly alleged he was illegally fired because of his lawful possession of a concealed firearm on his employer's—Defendant-Appellee UPS Supply Chain Solutions' ("UPS SCS")—property.  Finding no genuine dispute as to any material fact, the district court granted UPS SCS and Defendant-Appellee Jeremy Fletcher, UPS SCS's Human Resources Sueprvisor, summary judgment.  Holly appealed, and we affirm.

## I. BACKGROUND

The material facts in this case are not in dispute.  UPS SCS hired Holly in October 2010 to work as a part-time supervisor in the Healthcare Division at its Outer Loop facility in Kentucky.  After about six months with the company, Holly transitioned to a full-time Operations Supervisor role, which is the position he held at the time his employment ended in

May 2013.  On April 1, 2013, Holly experienced car trouble on his way to work at UPS SCS. After he arrived, he asked his manager, Ron Nolan, for permission to leave work to take his vehicle to a repair shop.  Nolan agreed and sent a fellow member of management with Holly to drive him back to work from the shop.

Holly testified that as he was leaving work, he remembered that he had stored a handgun in the center console of his car.  Holly had obtained his concealed carry license in 2012, and, from at least that time forward, he carried a handgun in his vehicle every day.  Because Holly did not want to leave his handgun in the car while it was at the shop, he asked a subordinate employee, Kenneth Moore (who was working at the time), if he could store the gun in Moore's vehicle while his was being repaired.  Moore agreed, and, in the UPS SCS parking lot, Holly removed the gun from his car and placed it in Moore's.

While Holly was at the repair shop, Moore began to worry about his temporary possession of Holly's gun.  Moore felt so uncomfortable that he reported Holly's request to a supervisor, who referred the matter to Nolan.  Nolan discussed the incident with Holly upon his return from the shop, reminding him of UPS SCS's policy, which reads, "We also prohibit the possession and/or use of weapons by any employee on UPS property."  Holly was not disciplined, however, and at the end of the day he retrieved his gun from Moore's vehicle.

UPS SCS security and management later became aware of the incident through an unrelated investigation.  UPS SCS initially suspended Holly on May 10, 2013, and, upon the conclusion of an internal investigation, terminated his employment on May 20, 2013.  At that time, UPS SCS cited two reasons for Holly's termination: Holly's poor performance review in 2011 and the fact that Holly had asked a subordinate (Moore) for a personal favor on company

time.[1]   Holly filed suit in Jefferson Circuit Court of the Commonwealth of Kentucky in

September 2013, alleging that UPS SCS and its Human Resources Supervisor, Fletcher, violated

Kentucky Revised Statutes §§ 527.020 and 237.106 by firing him and that his termination

constituted wrongful discharge in violation of the public policy evidenced by those statutes.[2]

Fletcher and UPS SCS removed the case to the United States District Court for the Western

District of Kentucky on the basis of diversity jurisdiction, 28 U.S.C. §§ 1332 and 1441.  Upon

completion of discovery, both defendants sought summary judgment.  Because it found that

Holly could not establish the essential elements of a wrongful termination claim under Kentucky

law, the district court granted defendants-appellees' motion.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's granting of summary judgment.  *Tysinger v. Police

Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).   Summary judgment is

appropriate if there is no genuine dispute as to any material fact, that is, when "the nonmoving

party has failed to make a sufficient showing on an essential element of her case with respect to

which she has the burden of proof."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also*

Fed. R. Civ. P. 56(a), (c).  Where, as here, we have diversity jurisdiction under 28 U.S.C. § 1332,

the substantive law governing the action is that of the forum state, *see Erie R.R. v. Tompkins*, 304

U.S. 64, 79 (1938), but it is the federal standard that governs the motion for summary judgment,

*see McBride v. Acuity*, 510 F. App'x 451, 452 (6th Cir. 2013) (additional citations omitted).

---

[1]After the litigation started in the instant case, UPS SCS elaborated on these reasons in an interrogatory, stating that the reasons for Holly's termination were: (1) misusing company time; (2) exhibiting poor decision-making skills; (3) putting a subordinate in an awkward and potentially risky position; and (4) general performance issues.

[2]He voluntarily dismissed the latter two claims as to Fletcher and sought leave to amend his complaint to reflect the dismissal.  The district court allowed the amendment and denied Fletcher's motion to dismiss the remaining claim against him, finding that Holly had stated a plausible claim for relief under § 527.020.

## B. Wrongful Termination under Kentucky Law

We begin our analysis with the well-established principle under Kentucky law, that "[o]rdinarily an employer may discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Grzyb v. Evans*, 700 S.W.2d 730, 731 (Ky. 1983) (quoting *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1984)). Kentucky's de facto at-will employment rule may be abrogated by contract or statute. *Id.* at 400–02; *see also Jackson v. JB Hunt Transport, Inc.*, 384 S.W.3d 177, 183 (Ky. Ct. App. 2012) ("Generally, in the absence of a specific contractual provision to the contrary, employment in Kentucky is terminable at-will . . . .") (citations omitted) (internal quotation marks omitted). Kentucky common law also recognizes a narrow cause of action for wrongful termination when the discharge was "contrary to a fundamental and well-defined public policy as evidenced . . . by a constitutional or statutory provision." *Grzyb*, 700 S.W.2d at 401. "The decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact." *Id.* A discharge falling within the public policy exception to Kentucky's terminable-at-will rule is actionable only:

> (1) Where there are explicit legislative statements prohibiting the discharge, (2) where the alleged reason for the discharge . . . was the employee's failure or refusal to violate a law in the course of employment, or (3) when the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment.

*Mitchell v. Univ. of Ky.*, 366 S.W.3d 895, 898 (Ky. 2012) (citations omitted) (internal quotation marks omitted).

## C. Application of Kentucky Law to Holly's Wrongful Termination Claim

Because Kentucky is an at-will employment jurisdiction, Holly must first demonstrate that he falls within at least one of the three exceptions that Kentucky law recognizes to the

default at-will employment relationship. The record does not support—nor do the parties contend—that there was a contractual exception to Kentucky's at-will employment rule. Holly therefore rests his claim for wrongful termination on two statutory provisions and the general public policy exception.

Holly first argues that Kentucky Revised Statutes § 527.020 provides him with "the legal right and evidence[s] the public policy affording Holly the right to keep a handgun in his vehicle while on his employer's, UPS's property." This statute, while found in the Kentucky penal code, creates a civil cause of action. *Mitchell*, 366 S.W.3d at 902. The statute provides in relevant part:

> No person, public or private, shall prohibit a person licensed to carry a concealed deadly weapon from possessing a firearm, ammunition, or both, or other deadly weapon in his or her vehicle in compliance with the provisions of KRS 237.110 and 237.115. *Any attempt by a person or organization, public or private, to violate the provisions of this subsection may be the subject of an action for appropriate relief or for damages in a Circuit Court or District Court of competent jurisdiction.*

Ky. Rev. St. § 527.020(4) (emphasis added); *see also* Ky. Rev. Stat. § 527.020(8) (including similar language and creating a civil cause of action). Thus, the act protected by subsection (4) is possessing a weapon or ammunition in one's vehicle "in compliance with the provisions of KRS 237.110 and 237.115."[3] Under § 237.110, a private employer "may not prohibit employees or other persons holding a concealed deadly weapons license from carrying concealed deadly weapons, or ammunition, or both *in vehicles owned by the employee*." Ky. Rev. Stat. § 237.110(17) (emphasis added).

The plain words of the statute make clear that Holly's actions do not fall within the protection of the statute. While it is undisputed that Holly possessed a gun in his vehicle on the

---

[3]Section 237.115 pertains to the carrying of concealed weapons in government buildings, which is inapplicable here.

UPS SCS premises—which *is* gun possession protected under Kentucky law—it is likewise undisputed that he removed the gun from his vehicle and placed it in another employee's vehicle—which is *not* gun possession "in compliance with the provisions of KRS 237.110," Ky. Rev. Stat. § 527.020(4); *see* § 237.110(17), and is not protected under the statute. Significantly, as the district court correctly pointed out, § 237.110(17) expressly contemplates disciplinary action for an employee's carrying a concealed weapon on the employer's premises. Ky. Rev. St. § 237.110(17) ("Carrying of a concealed weapon, or ammunition, or both in a location specified in this subsection by a license holder shall not be a criminal act but may subject the person to denial from the premises or removal from the premises, and, if an employee of an employer, disciplinary measures by the employer.").

Subsection (8) of § 527.020 provides no additional support for Holly's argument. That section unambiguously defines when a firearm or other deadly weapon is deemed concealed, which is when "it is located in any enclosed container, compartment, or storage space installed as original equipment in a motor vehicle by its manufacturer . . . ." Ky. Rev. St. § 527.020(8). "No person or organization, public or private, shall prohibit a person from keeping a loaded or unloaded firearm or ammunition, or both, or other deadly weapon *in a vehicle in accordance with the provisions of this subsection.*" *Id.* (emphasis added). Because Holly removed his handgun from his vehicle, his actions on April 1, 2013, are not protected under § 527.020.

Holly alternatively argues that his moving the handgun from his vehicle to Moore's vehicle is protected under Kentucky Revised Statutes § 237.106(3), which lists four situations in which a firearm may be "removed from the vehicle or handled": "[1] self-defense, [2] defense of another, [3] defense of property, or [4] as authorized by the owner, lessee, or occupant of the property." Section 237.106(3) imposes civil liability on "[a]n employer that fires, disciplines,

demotes, or otherwise punishes an employee who is lawfully exercising a right guaranteed by this section who is engaging in conduct in compliance with this statute . . . ." Holly argues that "defense of property" "should not be limited to handling a firearm to aggressively fight off others who may be trying to damage or steal property," the traditional understanding of the term. *See, e.g.*, 6 Am. Jur. 2d *Assault and Battery* § 128 (2016). Rather, Holly would have us read into Kentucky law a public policy exception for "promoting responsible gun possession/control." However, "[f]ederal courts should be 'extremely cautious about adopting "substantive innovation" in state law,'" *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 608 (6th Cir. 2012) (quoting *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 578 (6th Cir. 2004) (citation omitted)), and, however inclined we might be to believe that such an exception would be a good thing, we decline to construe the term "defense of property" as broadly as Holly petitions.

Thus, because Holly's actions on April 1, 2013, are protected by neither § 237.106 nor § 572.020, we hold that he cannot sustain a claim for wrongful termination under Kentucky law.[4] We also hold that because Holly is not protected by any Kentucky statute, his discharge did not fall within the public policy exception to Kentucky's terminable-at-will rule, as there was no explicit legislative statement prohibiting his discharge, nor was Holly exercising a right

---

[4]The dissent makes a strong argument that an employee does not automatically lose statutory protection forever based on his once having removed a concealed handgun from his vehicle on his employer's property. While this may be true, Holly has not presented a genuine issue of material fact with respect to whether he was fired for legally possessing a concealed handgun in his vehicle at all times before April 1, 2013, and/or at all times after April 1, 2013. It is true that UPS SCS's continuing to deny that it fired Holly because of the April 1 incident has made this case somewhat more difficult to analyze. But in discussing whether a jury could find that UPS SCS's proffered justifications for dismissing Holly are pretextual, the dissent actually highlights UPS SCS's focus on the activities that occurred on April 1, 2013 (including the internal investigation, Holly's being escorted off UPS SCS property on May 10, 2013, UPS SCS's staff's emails regarding potential litigation in the aftermath of the April 1 incident, and the theft-of-time argument). Although UPS SCS also stated that Holly's prior poor performance evaluation was a factor in its determination to fire him, this, alone, does not give rise to a genuine dispute of material fact as to whether Holly was actually fired for keeping his handgun in his vehicle before or after April 1, 2013. Furthermore, we do not understand Kentucky wrongful termination law in this context to create a burden-shifting framework, which the dissent appears to use in its analysis. It is Holly's burden to demonstrate not only that he was protected by the Kentucky statute, but that UPS SCS fired him for possessing a handgun in his vehicle. He has not done so here, and—at risk of belaboring the point—any discussion of pretext is irrelevant.

conferred by well-established legislative enactment. *See Mitchell*, 366 S.W.2d at 898. We find

support for our decision in prior cases addressing similar questions. For example, one district

court has held that it is of no moment that the gun was *initially* or almost always stored in the

vehicle of the holder of a license for concealed deadly weapon. *Korb v. Voith Indus. Servs., Inc.*,

No. 3:12-CV-00222-H, 2012 WL 7062365, at *3 (W.D. Ky. Nov. 28, 2012) ("In sum, while

Kentucky law certainly protects Korb's right to possess the handgun in his vehicle at work, this

protection does not extend to the handling of the firearm. Although the punishment for Korb's

indiscretion was perhaps severe, Voith has the discretion to terminate an employee who violates

company policies in such a way that does not run contrary to state or federal statutory or

constitutional law."). In *Korb*, the district court noted that "had Korb merely stored the gun in

his vehicle [rather than revealing it to a security officer], the [Kentucky] statute would have

protected his actions." *Id.* at *6; *see also Mullins v. Marathon Petroleum Co.*, No. 12-108-HRW,

2014 WL 467240, at *4 (E.D. Ky. Feb. 5, 2014) ("As the firearm was not concealed in any

enclosed container or compartment in Mr. Mullins [sic] vehicle, Plaintiffs' claim under KRS

§ 527.020(8) fails as a matter of law.").

 Despite his creative attempts to stretch Kentucky law to cover his actions on April 1,

2013, Holly cannot demonstrate that any federal or state statute or constitutional provision

applies in this case. However commendable his intentions in transferring his handgun to another

employee's car may have been, the fact remains that Holly—while on UPS SCS's property—

removed his gun from his vehicle. Regardless of how long he handled the gun in transporting it

to Moore's vehicle (or back to his), Holly lost statutory protection from being discharged for

possessing a gun inside his vehicle when he removed the gun from his vehicle. Hence, Holly's

extensive discussion regarding whether a jury could have found UPS SCS's proffered reasons for

discharging him to be "pretexts" is immaterial.[5]  Because the default employment relationship in Kentucky is at will, UPS SCS and its agents (in this case, Fletcher) could fire Holly "for good cause, for no cause, or for a cause that some might view as morally indefensible." *McDonald v. Webasto Roof Systems, Inc.*, 570 F. App'x 474, 477 (6th Cir. 2014) (quoting *Noel v. Elk Brand Mfg. Co.*, 53 S.W.3d 95, 98 (Ky. Ct. App. 2000), and *Firestone Textile Co.*, 666 S.W.2d at 731 (footnote omitted) (internal quotation marks omitted)).  Although UPS SCS continues to deny that it fired Holly because of his possession of a firearm, because Holly lost statutory protection—even just for one day—UPS SCS is not prohibited by Kentucky law from firing Holly for that very reason.[6]  In other words, if we assume UPS SCS fired Holly because of the firearm incident (*i.e.*, that UPS SCS's stated reasons for terminating Holly's employment are, in fact, pretexts), what difference does it make?  Holly wants a jury to find that UPS SCS actually fired him because of the gun incident, but UPS SCS is within its rights to fire an employee who may have violated company policy[7] and whose actions fell outside the protection of Kentucky law.

### III. CONCLUSION

Because Holly cannot show that a statutory or public policy exception to Kentucky's at-will employment rule applies to him, the district court was correct in granting summary judgment for UPS SCS and Fletcher.  For that reason, we affirm the district court.

---

[5]Indeed Holly's argument concerning "pretext" is altogether beside the point: because UPS SCS's decision to fire Holly did not run afoul of Kentucky law, any discussion of pretext is irrelevant.  Furthermore, UPS SCS's allegedly pretextual reasons for terminating Holly's employment are legally permissible justifications for firing an employee in Kentucky.

[6]We therefore reject Holly's argument that because he continued to store his firearm in his vehicle during the five weeks between the April 1 incident and his May 10 suspension/termination, UPS SCS violated Kentucky law when it later chose to fire him.

[7]UPS SCS's policy is not directly at issue here, but Holly implies that UPS SCS "was attempting to enforce its Crisis Management & Workplace Violence Prevention Policy prohibiting the possession and/or use of weapons by any employee on UPS property, regardless of any legal rights and protections afforded Holly under [Ky. Rev. St. §§ 527.020, 237.110, 237.106]."  The fact is, however, that nothing in Kentucky law prohibits UPS from proscribing firearms on its property that are not concealed in its employees' vehicles. *See* Ky. Rev. Stat. § 237.110(17).

ROGERS, Circuit Judge, dissenting.  Because Kentucky law protects Holly's keeping a gun in his car on UPS property, and because Holly has presented sufficient circumstantial evidence that UPS fired him for that protected conduct to survive summary judgment, I dissent.

It is possible that UPS fired Holly for protected conduct.  Kentucky statutory law affirmatively permits an employee with a concealed-carry license to keep a firearm in his vehicle while on his employer's property and provides the employee a cause of action against his employer for disciplining the employee for doing so.  *See* Ky. Rev. Stat. Ann. §§ 237.106(1), (4), 527.020(4).  Accordingly, Kentucky common law regarding employment at will is not relevant to this appeal.  If UPS fired Holly, not for transferring his gun to Moore's car, but for the mere fact that Holly stored a gun in his car at work—at times other than the April 1, 2013 incident— Holly has a viable claim for wrongful termination.  It is true that Kentucky law generally does not protect an employee's removing his firearm from his vehicle on his employer's property, except under four limited circumstances.  *See* Ky. Rev. Stat. Ann. §§ 237.106(3), 237.110(17).  But such activity does not automatically remove the general statutory protection.[1]

Instead, two questions control whether the district court correctly granted summary judgment in favor of UPS: First, did Holly argue below that UPS actually fired him for keeping his gun in his car on UPS property—not for the act of moving the gun from his car to Moore's— under the pretext of firing him for asking a subordinate employee for a personal favor on company time?  Second, is there sufficient evidence of this pretext for Holly's claims to survive summary judgment?  On balance, the answer to both is yes.

In opposition to UPS's motion for summary judgment, Holly argued below that the company's proffered reasons for firing him were pretext, and that UPS actually "adversely acted

---

[1]It cannot be that, if an employee regularly, legally stores a gun in his car on his employer's property, but removes the gun once, the employee loses protection under Kentucky Revised Statutes §§ 237.106 and 527.020, and can never store a gun in the car at work again without fear of being disciplined.

against him because of his having a gun in his vehicle at work." R.26, PgID #640; *see also id.* at 643 (noting that the circumstantial evidence supports "the fact that a jury could reasonably believe that Holly's having a gun on UPS property was the real reason for his termination and that a violation of KRS 527.020 or KRS 237.106 had occurred"); *id.* at 648 ("A jury can reasonably conclude that the Defendant's proffered reasons for the termination are mere pretext to mask the true illegal motives, and it could find the true reasons for Holly's termination were to prohibit the Plaintiff from having a gun on its property . . . .").

Holly's assertion that, because UPS did not purport to fire him for removing his gun from his car, it does not matter that transferring the gun to Moore's car was not protected activity, caused confusion about what Holly was actually arguing to the district court, however. *See Holly v. UPS Supply Chain Solutions, Inc.*, 163 F. Supp. 3d 465, 468–69 (W.D. Ky. 2016). But, taken in context, this portion of Holly's argument aligns with his overall theory of pretext. Holly states that it does not matter whether Kentucky law protected him when he moved his gun on April 1, 2013, because he is not arguing that UPS fired him for that incident. Rather, he is arguing that UPS fired him for keeping a gun in his car on UPS property at all other times, when he did not remove it from the car, which is protected activity. Holly reinforces this logic by referring to the earlier district court opinion that denied UPS's motion to dismiss. The earlier opinion clearly laid out the argument Holly was trying to make later in opposition to summary judgment:

> Defendant . . . is correct that *some* of Plaintiff's behavior—namely the requesting of a personal favor to the extent it involved moving of the firearm between vehicles—is not covered by 527.020. However, clearly Plaintiff's behavior of keeping the firearm in his vehicle or in the vehicle of another is protected by 527.020(4) and 527.020(8) respectively. While Defendant contends that the reason for the termination was that Plaintiff asked a subordinate employee for a personal favor while on company time, Plaintiff argues this is merely pretext

for the illegal motive for his termination—which includes violations of KRS 521.020.

*Holly v. UPS Supply Chain Solutions, Inc.*, 996 F. Supp. 2d 537, 541 (W.D. Ky. 2014) (footnote omitted).

Because Holly adequately argued to the district court that UPS's proffered explanation for firing him covered up an illegal motive, the next relevant question for this appeal is whether Holly has presented enough evidence of this pretext to survive summary judgment. Ron Nolan, Holly's manager, interpreted and applied what appeared to be a "no gun" policy on April 1, 2013. In Nolan's written statement from the incident, he recalled: "I informed [Holly] of the rules about having a firearm on property. He was not allow[ed] to have it regardless of him having a firearm license. I asked him to make sure he removed it ASAP from the property." Additionally, the UPS facility where Holly worked has a sign posted on the front gate that reads: "Possession of weapons on all UPS property is strictly prohibited except as otherwise mandated by law." It was this sign that made Moore feel uncomfortable about housing Holly's gun in his car.

Furthermore, discovery in this case revealed many relevant details about the UPS investigation into the April 1, 2013 incident and the employer's decision-making process. When JB Keown, the UPS security investigator for Kentucky, found out about the incident through an unrelated matter, he immediately investigated the situation by taking written statements from Holly, Moore, and Nolan on May 6, 2013. The UPS HR department was not involved in this initial investigation, which Keown considered a "safety, possible workplace violence issue." Based on the written statements, Keown prepared an "Executive Summary," which summed up

the relevant employees' versions of the event. The Summary's subject line read "Firearm on Property." Keown sent the memorandum to three HR officials on May 8.

At that point, security essentially handed off the investigation to the HR department, though there was still communication between security and HR. Holly was suspended and escorted off UPS property on May 10. At some point after May 8, either before or after Holly's suspension, the HR department pulled his quality performance reviews and employee opinion survey results from 2011 and 2012. But only after Holly's suspension did the department request employee badge scans and timecards from the day of the incident.

Several communications among UPS management during this time period, after Holly was suspended but before he was fired, are also relevant. On May 10, a mid-level security manager emailed Keown: "I need to see your case file on this when complete, this could go to litigation, need to ensure everything is properly documented." The security manager also stated in an email on May 13: "I would anticipate some legal challenge on his separation." In the same May 13 email chain, the manager referred to Holly as a "former" supervisor, and an HR manager stated: "We separated this" supervisor. The investigation culminated in Holly's termination on May 20, 2013.

From these facts, and those detailed in the majority opinion, there is, on balance, sufficient circumstantial evidence that UPS fired Holly for protected activity for Holly's claims to survive summary judgment. To prove wrongful termination in Kentucky, an employee must "show the protected activity was 'a substantial and motivating factor but for which the employee would not have been discharged.'" *Follett v. Gateway Regional Health Sys., Inc.*, 229 S.W.3d 925, 929 (Ky. Ct. App. 2007) (quoting *First Prop. Mgmt. Corp. v. Zarebidaki*, 867 S.W.2d 185, 188 (Ky. 1993)). Kentucky courts recognize that there is rarely a smoking gun in such cases and

that plaintiffs frequently must rely on circumstantial evidence. *Id.* Holly has presented enough circumstantial evidence to create a jury question over whether UPS's proffered rationale for firing him—asking a subordinate employee for a personal favor, coupled with poor performance reviews—was pretextual.

A jury could reasonably believe that UPS did not fire Holly for asking Moore to store Holly's gun while "on company time." A UPS HR representative testified at Holly's unemployment-benefits hearing that the company's decision was "not related to the handgun," and that the company would have made the same decision had Holly "asked [Moore] to go wash his car or go . . . get him lunch . . . on company time." If the company's decision was based on its theft-of-time policy, it is reasonable to infer that, before it decided to discipline Holly, it would have verified that Moore was on the clock when he performed the "personal favor." But no one at UPS requested any time records until May 16, and Holly has presented facts that could lead a reasonable jury to conclude that UPS decided to fire him before May 16—Holly was suspended on May 10; an email chain among UPS security and HR managers on May 13 referred to Holly as "separated" and a "former supervisor"; and a senior HR manager stated in her deposition that she made the decision to terminate Holly without reviewing the time records. A jury could reasonably infer from these facts that UPS manufactured a reason to fire Holly after having already made the decision to terminate him, perhaps with an illegal motive.

Several additional facts support this conclusion. UPS never established whether Moore was taking his fifteen-minute break, which he was entitled to and could have used any way he wanted, when he helped Holly. Furthermore, both Holly and Moore stated in their depositions that UPS employees previously have performed personal favors for supervisors without the supervisors being disciplined. Finally, two emails—one from May 10 and the other from May

13—from a security manager state that he anticipated litigation over Holly's termination. It was only around that same time period, after JB Keown circulated the Executive Summary on May 8, that any UPS official requested the time records from the April 1 incident or Holly's performance reviews. These facts support an inference that UPS did not verify its proffered reasons for suspending, and ultimately firing, Holly until after it disciplined him. From that, a reasonable jury could infer that UPS used the theft-of-time policy and performance reviews as a pretext for a hidden motive for firing Holly.

It is doubtless true that, if UPS used the theft-of-time policy and performance reviews as a pretext to fire Holly for transferring the firearm in the parking lot, there would still be no liability. As discussed above, Holly must prove that the true reason for his termination was not his transferring a gun to Moore's car, but, as Holly describes it, "fear that UPS and/or its employees had become aware that Holly regularly brought a firearm in his vehicle upon UPS's property and that UPS was attempting to keep Holly from doing such and discourage other employees" from doing the same. Two factors potentially show a connection between this protected activity and Holly's termination: First, the UPS employee handbook, on its face, prohibits "the possession and/or use of weapons by any employee on UPS property." This prohibition is not qualified by any of the limitations imposed by state law, and the fact that Nolan told Holly on April 1, 2013, that he was not allowed to have a gun on UPS property may lead a jury to believe that UPS enforces its policy. At the very least, the handbook provides some indication that UPS is hostile to employees bringing guns onto its property. Second, UPS essentially treated its initial investigation into the April 1 incident as a security matter. For example, Keown testified that he considered the incident a "safety, possible workplace violence issue." Keown also posted Holly's photo in the UPS facility's guard shack to ensure he would

not be allowed back on the property after he was suspended, which is not a routine practice for all suspended employees. Furthermore, the subject line of Keown's Executive Summary was "Firearm on Property," indicating the investigation was focused on the gun.

UPS responds by arguing that, because Holly continued to keep a gun in his car at work after April 1 without discipline, and because other UPS employees store firearms in their cars in the UPS parking lot, Holly's termination could not possibly have been based on his lawfully keeping a gun on UPS property. These arguments do not overcome Holly's evidence of pretext as a matter of law. Asserting that Holly was not disciplined for bringing his gun on UPS property after April 1 assumes UPS did not fire Holly for that very reason, the core issue in this case. Clearly UPS did not *say* it was firing Holly for having the gun, but that does not mean the company's hidden motive was not Holly's protected activity. Furthermore, although there is evidence in the record that at least two other employees at Holly's UPS facility keep guns in their cars on UPS property on a regular basis, there is no evidence that UPS knew that fact until Holly's deposition in this case. The company could not have taken disciplinary measures against these employees when it did not know about their guns, and it likely would not do so once it found out about their keeping guns on UPS property, when UPS was already being sued for that exact alleged behavior. Thus, UPS's arguments may not convince a reasonable jury.

Therefore, the district court erred by rejecting Holly's argument that a genuine question of material fact precludes summary judgment in this case. Rather, Holly has presented enough evidence of a connection between his termination and his keeping a gun on UPS property, which is protected under Kentucky law, to submit his claims to a jury.

Holding this way, moreover, does not effectively preclude discipline for employee violations of permitted employer firearm limits, even though such violations may inherently

come before or after protected activity.  In this case, however, UPS did not even argue that it was

firing Holly for reasons permitted by Kentucky Revised Statutes §§ 237.106(3) and 237.110(17).