ROGERS, Circuit Judge,
dissenting.
Because Kentucky law protects Holly’s keeping a gun in his car on UPS property, and because Holly has presented sufficient circumstantial evidence that UPS fired him for that protected conduct to survive summary judgment, I dissent.
It is possible that UPS fired Holly for protected conduct. Kentucky statutory law affirmatively permits an employee with a concealed-carry license to keep a firearm in his vehicle while on his employer’s property and provides the employee a cause of action against his employer for disciplining the employee for doing so. See Ky. Rev. Stat. Ann. §§ 237.106(1), (4), 527.020(4). Accordingly, Kentucky common law regarding employment at will is not relevant to this appeal. If UPS fired Holly, not for transferring his gun to Moore’s car, but for the mere fact that Holly stored a gun in his ear at work—at times other than the April 1, 2013 incident—Holly has a viable claim for wrongful termination. It is true that Kentucky law generally does not protect an employee’s removing his firearm from his vehicle on his employer’s property, except under four limited circumstances. See Ky. Rev. Stat. Ann. §§ 237.106(3), 237.110(17). But such activity does not automatically remove the general statutory protection.[1]
Instead, two questions control whether the district court correctly granted summary judgment in favor of UPS: First, did *465 Holly argue below that UPS actually fired him for keeping his gun in his car on UPS property—not for the act of moving the gun from his car to Moore’s—under the pretext of firing him for asking a subordinate employee for a personal favor on company time? Second, is there sufficient evidence of this pretext for Holly’s claims to survive summary judgment? On balance, the answer to both is yes.
In opposition to UPS’s motion for summary judgment, Holly argued below that the company’s proffered reasons for firing him were pretext, and that UPS actually “adversely acted against him because of his having a gun in his vehicle at work.” R.26, PgID #640; see also id. at 643 (noting that the circumstantial evidence supports “the fact that a jury could reasonably believe that Holly’s having a gun on UPS property was the real reason for his termination and that a violation of KRS 527.020 or KRS 237.106 had occurred”); id. at 648 (“A jury can reasonably conclude that the Defendant’s proffered reasons for the termination are mere pretext to mask the true illegal motives, and it could find the true reasons for Holly’s termination were to prohibit the Plaintiff from having a gun on its property....”).
Holly’s assertion that, because UPS did not purport to fire him for removing his gun from his car, it does not matter that transferring the gun to Moore’s car was not protected activity, caused confusion about what Holly was actually arguing to the district court, however. See Holly v. UPS Supply Chain Solutions, Inc., 163 F.Supp.3d 465, 468-69 (W.D. Ky. 2016). But, taken in context, this portion of Holly’s argument aligns with his overall theory of pretext. Holly states that it does not matter whether Kentucky law protected him when he moved his gun on April 1, 2013, because he is not arguing that UPS fired him for that incident. Rather, he is arguing that UPS fired him for keeping a gun in his car on UPS property at all other times, when he did not remove it from the car, which is protected activity. Holly reinforces this logic by referring to the earlier district court opinion that denied UPS’s motion to dismiss. The earlier opinion clearly laid out the argument Holly was trying to make later in opposition to summary judgment:
Defendant ... is correct that some of Plaintiffs behavior—namely the requesting of a personal favor to the extent it involved moving of the firearm between vehicles—is not covered by 527.020. However, clearly Plaintiffs behavior of keeping the firearm in his vehicle or in the vehicle of another is protected by 527.020(4) and 527.020(8) respectively. While Defendant contends that the reason for the termination was that Plaintiff asked a subordinate employee for a personal favor while on company time, Plaintiff argues this is merely pretext for the illegal motive for his termination—which includes violations of KRS 521.020.
Holly v. UPS Supply Chain Solutions, Inc., 996 F.Supp.2d 537, 541 (W.D. Ky. 2014) (footnote omitted).
Because Holly adequately argued to the district court that UPS’s proffered explanation for firing him covered up an illegal motive, the next relevant question for this appeal is whether Holly has presented enough evidence of this pretext to survive summary judgment. Ron Nolan, Holly’s manager, interpreted and applied what appeared to be a “no gun” policy on April 1, 2013. In Nolan’s written statement from the incident, he recalled: “I informed [Holly] of the rules about having a firearm on property. He was not allow[ed] to have it regardless of him having a firearm license. I asked him to make sure he removed it ASAP from the property.” Additionally, *466 the UPS facility where Holly worked has a sign posted on the front gate that reads: “Possession of weapons on all UPS property is strictly prohibited except as otherwise mandated by law.” It was this sign that made Moore feel uncomfortable about housing Holly’s gun in his car.
Furthermore, discovery in this case revealed many relevant details about the UPS investigation into the April 1, 2013 incident and the employer’s decision-making process. When JB Keown, the UPS security investigator for Kentucky, found out about the incident through an unrelated matter, he immediately investigated the situation by taking written statements from Holly, Moore, and Nolan on May 6, 2013. The UPS HR department was not involved in this initial investigation, which Keown considered a “safety, possible workplace violence issue.” Based on the written statements, Keown prepared an “Executive Summary,” which summed up the relevant employees’ versions of the event. The Summary’s subject line read “Firearm on Property.” Keown sent the memorandum to three HR officials on May 8.
At that point, security essentially handed off the investigation to the HR department, though there was still communication between security and HR. Holly was suspended and escorted off UPS property on May 10. At some point after May 8, either before or after Holly’s suspension, the HR department pulled his quality performance reviews and employee opinion survey results from 2011 and 2012. But only after Holly’s suspension did the department request employee badge scans and timecards from the day of the incident.
Several communications among UPS management during this time period, after Holly was suspended but before he was fired, are also relevant. On May 10, a mid-level security manager emailed Keown: “I need to see your case file on this when complete, this could go to litigation, need to ensure everything is properly documented.” The security manager also stated in an email on May 13: “I would anticipate some legal challenge on his separation.” In the same May 13 email chain, the manager referred to Holly as a “former” supervisor, and an HR manager stated: “We separated this” supervisor. The investigation culminated in Holly’s termination on May 20, 2013.
From these facts, and those detailed in the majority opinion, there is, on balance, sufficient circumstantial evidence that UPS fired Holly for protected activity for Holly’s claims to survive summary judgment. To prove wrongful termination in Kentucky, an employee must “show the protected activity was ‘a substantial and motivating factor but for which the employee would not have been discharged.’ ” Follett v. Gateway Regional Health Sys., Inc., 229 S.W.3d 925, 929 (Ky. Ct. App. 2007) (quoting First Prop. Mgmt. Corp. v. Zarebidaki, 867 S.W.2d 185, 188 (Ky. 1993)). Kentucky courts recognize that there is rarely a smoking gun in such cases and that plaintiffs frequently must rely on circumstantial evidence. Id. Holly has presented enough circumstantial evidence to create a jury question’ over whether UPS’s proffered rationale for firing him—asking a subordinate employee for a personal favor, coupled with poor performance reviews— was pretextual.
A jury could reasonably believe that UPS did not fire Holly for asking Moore to store Holly’s gun while “on company time.” A UPS HR representative testified at Holly’s unemployment-benefits hearing that the company’s decision was “not related to the handgun,” and that the company would have made the same decision had Holly “asked [Moore] to go wash his car or go *467 ... get him lunch ... on company time.” If the company’s decision was based on its theft-of-time policy, it is reasonable to infer that, before it decided to discipline Holly, it would have verified that Moore was on the clock when he performed the “personal favor.” But no one at UPS requested any time records until May 16, and Holly has presented facts that could lead a reasonable jury to conclude that UPS decided to fire him before May 16— Holly was suspended on May 10; an email chain among UPS security and HR managers on May 13 referred to Holly as “separated” and a “former supervisor”; and a senior HR manager stated in her deposition that she made the decision to terminate Holly without reviewing the time records. A jury could reasonably infer from these facts that UPS manufactured a reason to fire Holly after having already made the decision to terminate him, perhaps with an illegal motive.
Several additional facts support this conclusion. UPS never established whether Moore was taking his fifteen-minute break, which he was entitled to and could have used any way he wanted, when he helped Holly. Furthermore, both Holly and Moore stated in their depositions that UPS employees previously have performed personal favors for supervisors without the supervisors being disciplined. Finally, two emails—one from May 10 and the other from May 13—from a security manager state that he anticipated litigation over Holly’s termination. It was only around that same time period, after JB Keown circulated the Executive Summary on May 8, that any UPS official requested the time records from the April 1 incident or Holly’s performance reviews. These facts support an inference that UPS did not verify its proffered reasons for suspending, and ultimately firing, Holly until after it disciplined him. From that, a reasonable jury could infer that UPS used the theft-of-time policy and performance reviews as a pretext for a hidden motive for firing Holly.
It is doubtless true that, if UPS used the theft-of-time policy and performance reviews as a pretext to fire Holly for transferring the firearm in the parking lot, there would still be no liability. As discussed above, Holly must prove that the true reason for his termination was not his transferring a gun to Moore’s car, but, as Holly describes it, “fear that UPS and/or its employees had become aware that Holly regularly brought a firearm in his vehicle upon UPS’s property and that UPS was attempting to keep Holly from doing such and discourage other employees” from doing the same. Two factors potentially show a connection between this protected activity and Holly’s termination: First, the UPS employee handbook, on its face, prohibits “the possession and/or use of weapons by any employee on UPS property.” This prohibition is not qualified by any of the limitations imposed by state law, and the fact that Nolan told Holly on April 1, 2013, that he was not allowed to have a gun on UPS property may lead a jury to believe that UPS enforces its policy. At the very least, the handbook provides some indication that UPS is hostile to employees bringing guns onto its property. Second, UPS essentially treated its initial investigation into the April 1 incident as a security matter. For example, Keown testified that he considered the incident a “safety, possible workplace violence issue.” Keown also posted Holly’s photo in the UPS facility’s guard shack to ensure he would not be allowed back on the property after he was suspended, which is not a routine practice for all suspended employees. Furthermore, the subject line of Keown’s Executive Summary was “Firearm on Property,” indicating the investigation was focused on the gun.
*468 UPS responds by arguing that, because Holly continued to keep a gun in his car at work after April 1 without discipline, and because other UPS employees store firearms in their cars in the UPS parking lot, Holly’s termination could not possibly have been based on his lawfully keeping a gun on UPS property. These arguments do not overcome Holly’s evidence of pretext as a matter of law. Asserting that Holly was not disciplined for bringing his gun on UPS property after April 1 assumes UPS did not fire Holly for that very reason, the core issue in this case. Clearly UPS did not say it was firing Holly for having the gun, but that does not mean the company’s hidden motive was not Holly’s protected activity. Furthermore, although there is evidence in the record that at least two other employees at Holly’s UPS facility keep guns in their cars on UPS property on a regular basis, there is no evidence that UPS knew that fact until Holly’s deposition in this case. The company could not have taken disciplinary measures against these employees when it did not know about their guns, and it likely would not do so once it found out about their keeping guns on UPS property, when UPS was already being sued for that exact alleged behavior. Thus, UPS’s arguments may not convince a reasonable jury.
Therefore, the district court erred by rejecting Holly’s argument that a genuine question of material fact precludes summary judgment in this case. Rather, Holly has presented enough evidence of a connection between his termination and his keeping a gun on UPS property, which is protected under Kentucky law, to submit his claims to a jury.
Holding this way, moreover, does not effectively preclude discipline for employee violations of permitted employer firearm limits, even though such violations may inherently come before or after protected activity. In this case, however, UPS did not even argue that it was firing Holly for reasons permitted by Kentucky Revised Statutes §§ 237.106(3) and 237.110(17).

. It cannot be that, if an employee regularly, legally stores a gun in his car on his employer’s property, but removes the gun once, the employee loses protection under Kentucky Revised Statutes §§ 237.106 and 527.020, and can never store a gun in the car at work again without fear of being disciplined.